UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA (ORLANDO)

| | | |
|---|---|---|
| RICHARD A. MCMAHAN, et al., | ) | CASE NO. 6:06-cv-00248-Orl-28KRS |
| | ) | |
| Plaintiffs | ) | JUDGE JOHN ANTOON II |
| | ) | MAGISTRATE JUDGE KARLA R. |
| v. | ) | SPAULDING |
| | ) | |
| ALLEN E. BARKER, et al., | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **DEFENDANTS MEGA CHURCH,** |
| Defendant | ) | **INC. AND BISHOP LUTHER J.** |
| | ) | **BLACKWELL, JR.'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |

## OVERVIEW

This case represents nothing more than Plaintiffs' attempt to take a second bite at the same apple, that apple being the only perceived set of deep pockets they can find, *i.e.*, the Mega Church Defendants.

In the summer of 2003, Plaintiffs were involved in a sequence of convoluted events, all designed to facilitate a "download" from an alleged master fund, which purportedly consisted of monies invested in an overseas oil operation. If successful, the download would have remitted millions of dollars to Plaintiffs. When the download failed to materialize, however, rather than take responsibility for their own actions, Plaintiffs rushed to hold someone else accountable. They have twice now attempted to make Defendant Mega Church, Inc. the responsible party. Plaintiffs' instant attempt, just as their prior, falls woefully short of establishing any legal liability to the Mega Church Defendants.

As set forth in detail below, Plaintiffs RAM Group and Mr. McMahan have already been awarded a judgment for the same damages they seek to recover from the Mega

Church Defendants in this case. They obtained a default judgment from a Florida state court just five months ago. Permitting them to recover against the Mega Church Defendants for the same alleged damages in this case would amount to inequitable double recovery.

Moreover, Plaintiffs cannot establish the essential elements of their lone claim against the Mega Church Defendants, *i.e.*, promissory estoppel. They have failed to put forward one piece of evidence of a clear and unambiguous promise, made by Bishop Blackwell, to Mr. McMahan/RAM Group, upon which Mr. McMahan/RAM Group detrimentally relied. Accordingly, Plaintiffs' promissory estoppel claim fails as a matter of law and should be summarily dismissed.

## STATEMENT OF FACTUAL BACKGROUND

In the summer of 2003, the parties to this action were brought together in order to achieve distinct goals. Plaintiffs sought to receive millions of dollars from the "download" of a purported billion dollar master fund maintained by Defendant Tri-Star Oil Corporation (UK) Ltd. ("Tri-Star"). (Amended Complaint, ¶¶15-21). The Mega Church Defendants sought to sell their church facility to an interested buyer, non-party Pastor Iyesha D. Feaster. (*See* Deposition of Dr. Luther J. Blackwell, Jr., p. 8, ln. 15-19, "Blackwell Dep." attached hereto as Exhibit A).[2] The other defendants named in this suit -- Allen E. Baker, Merchants International Holdings Limited ("Merchants Int'l"), Pacific Rim Development Group, LLC ("Pacific Rim"), and J.J. Jones, are the alleged coordinators of the plan to provide Plaintiffs with the multi-million dollar download. (Amended Complaint, ¶¶13-19, 24-26).

After having discussions with Pastor Feaster about selling the Mega Church facility, Bishop Blackwell agreed upon the sale and the two executed a Purchase/Right of Use

---

[2] A certified copy of the transcript from Bishop Blackwell's deposition has been filed with the Court. For ease of reference, a condensed version of the transcript has been reproduced and is attached hereto as Exhibit A.

Agreement (Blackwell Dep., p. 15, ln. 18-p. 16, ln. 11).   Pastor Feaster informed Bishop Blackwell that Thomas Settles, President and C.E.O. of Plaintiff Omega Paving Group LLC ("Omega Paving"), had monies that were available to her which could be put towards the purchase of the Mega Church facility.  (Id. at p. 17, ln. 3-21).

Soon after signing the Purchase/Right of Use Agreement with Pastor Feaster, Bishop Blackwell spoke with Mr. Settles who explained that he would be able to supply $550,000 to Mega Church as a portion of the purchase price to be paid by Pastor Feaster.  (Id. at p. 16, ln. 23-p. 18. ln. 21).   Mr. Settles explained that in order to carry out this transaction, however, Bishop Blackwell would have to sign a document, which would help Pastor Feaster purchase the church.  (Id. at p. 19, ln. 1-p. 20, ln. 25).  Because Bishop Blackwell was motivated to advance the sale of the Mega Church facility to Pastor Feaster, he executed a "Security Agreement" with Mr. Settles/Omega Paving on July 19, 2003.  (Id. at p. 19, ln. 8-p. 20, ln. 9; and Security Agreement, dated July 19, 2003, attached hereto as Exhibit B).  After waiting 90 days and receiving no money from either Pastor Feaster or Mr. Settles/Omega Paving, Bishop Blackwell cancelled the sale of the Mega Church facility.  (Blackwell Dep., p. 24, ln. 22-p. 25, ln. 10; and Letter from Bishop Blackwell to Pastor Feaster, dated October 22, 2003, attached hereto as Exhibit C).

Contemporaneously to working with Bishop Blackwell on the sale of the Mega Church facility, Mr. Settles was engaging in a transaction with Mr. DeLargy, President and Executive Director of Georgia REAL, and Mr. McMahan, President and CEO of RAM Group. (Amended Complaint, ¶¶13-20).   Mr. Settles, along with his purported business partner, Mr. Stephen Wilson, contacted Mr. DeLargy to discuss whether Georgia REAL was in need of funding and how it might qualify as a recipient of a portion of the multi-million dollar download.

(Amended Complaint, ¶¶16-18).   Messrs. Settles and Wilson had access to this master fund through their relationship with Mr. Jones (of Pacific Rim), who was working with Mr. Barker (of Merchants Int'l).  (Id. at ¶16)  Messrs. Settles and Wilson told Mr. DeLargy that because of the work performed through his not-for-profit organization, when the download from the master fund was to be distributed, Georgia REAL would qualify as the recipient of a certain percentage of the monies.  (Id. at ¶¶18-19; *see also* Deposition of Richard A. McMahan, p. 18, ln. 2-6, "McMahan Dep." attached hereto as Exhibit D).[3]  However, before Omega or Georgia REAL would be able to receive any of the funds from the download, Mr. Barker, acting on behalf of Merchants Int'l, informed Mr. Settles and Mr. DeLargy that they would need to supply Merchants Int'l with $480,000, to cover the alleged expenses associated with the download. (Amended Complaint, ¶19).

Because neither Omega Paving nor Georgia REAL had that much money available, Mr. DeLargy contacted his brother-in-law, Mr. McMahan (RAM Group), to see if RAM Group would be willing to loan the money to cover the expenses of this transaction.  (Id. at ¶20).  Mr. McMahan agreed to loan $480,000 to Georgia REAL in exchange for interest and a portion of the multi-million dollar download.  (Id. at ¶21).  Mr. McMahan also requested some form of collateral for the loan.  (Id.; *see also* McMahan Dep., p. 19, ln. 4-7)

It was at that point in time that the potential sale of the Mega Church facility and the multi-million dollar download transaction linked up.  Mr. Settles offered Mr. McMahan the "security interest" he believed he had in the Mega Church facility, arising from the "Security Agreement" Bishop Blackwell signed in connection with furthering the sale of the church facility, to serve as the collateral for RAM Group's loan.  (McMahan Dep., p. 64, ln. 6-p. 65, ln.

---

[3]  The original transcript of Mr. McMahan's deposition has been filed with the Court.  For ease of reference, a condensed version of the transcript has been reproduced and is attached hereto as Exhibit D.

5; *see also* Deposition of Thomas C. Settles, p. 155, ln. 20-24, "Settles Dep." attached hereto as Exhibit E).[4]  Around this same time, in an effort to keep all the balls in the air, Mr. Settles arranged for Bishop Blackwell to send correspondence to Mr. McMahan's attention, so as to further satisfy Mr. McMahan, even though Bishop Blackwell did not know who Mr. McMahan was at the time.  (Blackwell Dep., p. 30, ln. 13-p. 31, ln. 12; and Letter from Bishop Blackwell to Mr. McMahan, dated July 25, 2003, attached hereto as Exhibit F).

Mr. McMahan eventually agreed to accept the "security interest" he believed Omega Paving had in the Mega Church facility as the collateral for the loan, and so Mr. Settles, on behalf of Omega Paving, assigned the "Security Agreement" to Georgia REAL (incredibly, dated one day <u>before</u> Mr. Settles executed the "Security Agreement" with Mega Church, Inc.). (*See* Deposition of Paul DeLargy, p. 36, ln. 2-19, "DeLargy Dep." attached hereto as Exhibit G;[5] *see also* Assignment of Security, dated July 18, 2003, attached hereto as Exhibit H).  Georgia REAL then assigned its rights under the "Security Agreement" to RAM Group.  (McMahan Dep., p. 78, ln. 13-p. 79, ln. 16; *see also* Assignment of Security Agreement, dated August 14, 2003, attached hereto as Exhibit I).  RAM Group also obtained a promissory note executed by Mr. DeLargy, on behalf of Georgia REAL, in the amount of $550,000.  (McMahan Dep., p. 56, ln. 12-p. 57, ln. 2; *see also* Note, dated July 25, 2003, attached hereto as Exhibit J).  RAM Group ultimately loaned the money to Georgia REAL -- despite the fact that he did not receive an executed mortgage for the Mega Church property prior to doing so.  (Amended Complaint, ¶23; and McMahan Dep., p. 24, ln. 4-7).

---

[4]  The original transcript of Mr. Settles's deposition has been filed with the Court.  For ease of reference, a condensed version of the transcript has been reproduced and is attached hereto as Exhibit E.
[5]  The original transcript of Mr. DeLargy's deposition has been filed with the Court.  For ease of reference, a condensed version of the transcript has been reproduced and is attached hereto as Exhibit G.

As it turned out, none of the Plaintiffs received any disbursement from the alleged billion dollar master fund, and RAM Group was out the half a million dollars it had advanced to cover the expenses of the transaction. (Amended Complaint, ¶¶25-26).

Plaintiff RAM Group previously filed an action against Defendant Mega Church, Inc. in an Ohio state court, the Cuyahoga County Court of Common Pleas. That action, an attempt to enforce the purported "Security Agreement" signed by Bishop Blackwell, was voluntarily dismissed on August 25, 2005, on the heels of Mega Church, Inc. filing a motion for summary judgment. Pursuant to Ohio law, the time in which that action may be re-filed has expired.

In the instant suit, Plaintiffs have refined their claims against the Mega Church Defendants to just one issue: whether or not Bishop Blackwell promised someone that he would execute a mortgage on the Mega Church property in favor of RAM Group, and whether or not RAM Group (Mr. McMahan) reasonably acted in reliance upon that promise to its detriment by tendering the funds to cover the download expenses without having said mortgage in place first. (Id. at ¶¶39-42). As a result, Plaintiffs are proceeding with the instant suit against the Mega Church Defendants to recover the monies RAM Group loaned to cover the expenses of the download transaction. (Id. at ¶42).

## LAW AND ARGUMENT

### I.   The Summary Judgment Standard.

A court will grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see, e.g., Stachel v. City of Cape Canaveral*, 51 F. Supp.

6

2d 1326, 1329 (M.D. Fla. 1999).  Material facts are those that may affect the outcome of the case under the applicable substantive law.  Disputed issues of material fact preclude the entry of summary judgment, but factual disputes that are irrelevant or unnecessary do not.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of proving that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

Once a movant who does not bear the burden of proof on the pertinent claim or defense satisfies its initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact, the burden shifts to the party bearing the burden of proof on the pertinent claim or defense to come forward with specific facts showing that there is a genuine issue for trial.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  The non-movant must demonstrate that there is a material issue of fact that precludes summary judgment.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).  "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990) (citing *Anderson*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202).

## II.    Judgment against the Mega Church Defendants in this action would amount to a double recovery for Plaintiffs.

Plaintiffs seek to recover against the Mega Church Defendants for the monies RAM Group loaned to cover the download expenses in July 2003.  (*See* Amended Complaint, ¶¶40-42).  As an initial matter, while Plaintiffs' Amended Complaint alleges its damages against the Mega Church Defendants to be $550,000 (Id. at ¶42), Plaintiffs have repeatedly represented

that the amount of money loaned to cover the "download expenses" was $480,000.   (*See e.g.,* Amended Complaint, ¶¶19, 23, 64, 78, 85).

Plaintiffs have already been awarded a judgment for the recovery of the monies RAM Group loaned to cover the download expenses.   Allowing Plaintiffs to recover these monies from the Mega Church Defendants would amount to an inequitable, impermissible double recovery.  *Heller v. Plave*, 743 F. Supp. 1553, 1572 (S.D. Fla. 1990) ("Double recovery cannot be gained by a plaintiff for a single injury.")

In January 2006, three months before filing the instant case, Plaintiffs Richard A. McMahan and RAM Group filed a suit in the Circuit Court of the Seventh Judicial Circuit in and for Volusia County, Florida (the "Volusia County Suit").   (*See* Volusia County Complaint, attached hereto as Exhibit K).   In that case, Plaintiffs RAM Group and Mr. McMahan filed claims against their co-plaintiff in the instant action, Omega Paving, and two if its purported corporate officers, Mr. Settles, and Mr. Wilson. (Id. at p. 1)

In their Volusia County Complaint, among other things, Plaintiffs Mr. McMahan and RAM Group sought recovery for various loans made to Omega Paving and Mr. Settles, beginning with the $480,000 RAM Group originally lent in order to "finance" the download transaction, and ending with a $25,000 loan made in October 2005. (Id. at pp. 1-10)

Specifically significant to this action, in Count X of their Complaint, the Volusia County Plaintiffs sought repayment of $603,260 according to the terms of a Pledge Agreement entered into on April 12, 2004 between Mr. Settles (on behalf of Omega Paving), Mr. Wilson (individually), and Mr. McMahan (on behalf of RAM Group).  (Id. at ¶¶40-51; *see also* Pledge Agreement, attached as Exhibit B to the Volusia County Complaint). On page 1 of the Pledge Agreement, under the heading "Background," the Agreement states:

> RAM GROUP, INC. ('McMahan'), on behalf of Paul DeLargy/Georgia REAL and OMEGA, advanced a loan of $480,000 to finance a transaction that is anticipated to provide a return of $1,750,000 to Paul Delargy/Georgia REAL inclusive of McMahan's principal investment.
>
> In addition, anticipating earlier dates of completion of the first venture, McMahan advanced initial and subsequent loans to OMEGA totaling $120,000 and incurred legal expenses of $3,260. The total principal amount owed to Mr. McMahan, (barring the completion of the originating business relationship) is $603,260 ('original risk capital').

(Pledge Agreement, p. 1). Later in the Pledge Agreement, when setting forth the terms of the "Loan by McMahan," it again refers to the $603,260 due and owing, which was _inclusive_ of the $480,000 originally advanced by RAM Group as part of the download transaction. (Id. at p. 2, ¶2).

While the Volusia County Plaintiffs failed to perfect service against Stephen R. Wilson, on July 11, 2006, they were awarded default judgment against Omega Paving and Mr. Settles. (_See_ Partial Final Default Judgment, July 11, 2006, attached hereto as Exhibit L). In ¶E of the Court's opinion, it specifically referred to the $603,260 loan dated April 12, 2004, and in ¶1 of its Order, it ordered Omega Paving and Mr. Settles to pay $960,216.10 -- an amount that is inclusive of the $480,000 original loan. (Id. at pp. 2, 4).

During his deposition, Mr. Settles admitted that the monies being sought from the Mega Church Defendants in the instant matter are the same as those that were recovered by the Volusia County Plaintiffs in the Volusia County Suit. When asked questions specifically about the Pledge Agreement, he testified as follows:

> Q:    If I can direct your attention to Exhibit B to the Complaint. Exhibit B says Agreement, Omega Paving & Environmental Management Group, LLC and RAM Group, Inc. Do you see that?
>
> A.    Yes, sir.

\* \* \*

> Q.  If you go up to the previous paragraph, Background, RAM Group, Inc., McMahan, on behalf of Paul Delargy/Georgia REAL and Omega, advanced a loan of $480,000 to finance a transaction that is anticipated to provide a return of $1,750,000 to Paul DeLargy/Georgia REAL inclusive of McMahan's principal investment.
>
> Do you see that?
>
> A.  Yes, sir.
>
> Q.  The $480,000 there is money that Mr. McMahan lent for the download transaction, correct?
>
> A.  Yes, sir.
>
> Q.  . . .
>
> The $603,000 that he now has been awarded in the lawsuit against you and your company is related to the download transaction, correct?
>
> A.  Yes.

(Settles Dep., p. 68, ln. 10-14, p. 69, ln. 7-19, 22-25; *see also*, Settles Dep., p. 179, ln. 17-25, p. 180, ln. 1-5).

Plaintiffs are seeking to recover from the Mega Church Defendants that which they have already been awarded to recover from Omega Paving and Mr. Settles. They should not be permitted to recover the same $480,000 here against the Mega Church Defendants, as doing so would result in inequitable double recovery.[6]

---

[6]  Furthermore, the Clerk of this Court recently entered default judgment against Defendant Pacific Rim on September 27, 2006 (Document 76). Plaintiffs' Amended Complaint in the instant action asserts claims against Pacific Rim for, *inter alia*, recovering the money RAM Group loaned to cover the download expenses. (Amended Complaint, ¶¶27-31, 61-72, 73-94). Because the judgment against Pacific Rim includes recovery of the money loaned by RAM Group to cover the download expenses -- the same money at-issue in Plaintiffs' claim against the Mega Church Defendants -- Plaintiffs should be precluded from recovering against the Mega Church Defendants.

**III.    Plaintiffs' solitary claim against the Mega Church Defendants fails as a matter of law.**

    **A.    Ohio law governs Plaintiffs' promissory estoppel claim.**

A federal court sitting in diversity must apply the choice of law rules of the forum state in which it sits. *Klaxon Co. v. Stento Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Plaintiffs' promissory estoppel claim is considered a contract claim. *Motmanco, Inc. v. Fryguys, LLC*, 2005 U.S. Dist. LEXIS 33965, *13 n.4 (M.D. Fla. 2005).[7] With respect to contract claims, Florida has traditionally applied the *lex loci contractus* rule for choice of law determinations regarding issues of contract law. *Trumpet Vine Inv.., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1119 (11th Cir. 1996). According to this doctrine, the law applied to questions regarding the validity and substantive obligations of a contract is the law of state in which the contract is "made." *Ray-Hof Agencies, Inc. v. Petersen*, 123 So. 2d 251, 253 (Fla. 1960). Matters regarding the performance of a contract, however, are governed by the law of the place where the contract is to be performed. *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690, 701-02 (S.D. Fla. 2001). Generally, a contract is "made" under *lex loci contractus* where the last act necessary to complete the contract is done. *Id.* As specifically related to oral contracts, they are considered "made" in the state in which the oral agreement was reached. *ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1564 (S.D. Fla. 1997).

Any alleged promise made by Bishop Blackwell regarding the execution of a mortgage would have been made in Ohio, since Bishop Blackwell was located in Ohio when the alleged conversations regarding the church property took place. Moreover, the *performance* of the alleged promise, *i.e.*, Bishop Blackwell's execution of a mortgage on his Ohio church

---

[7] A copy of this decision is attached hereto as Exhibit M.

property, would have occurred in Ohio.  Therefore, under Florida's choice of law rules, Ohio law governs Plaintiffs' promissory estoppel claim.

**B.      Plaintiffs cannot establish that Bishop Blackwell made a promise upon which RAM Group relied.**

The only legal cause of action that remains pending against the Mega Church Defendants is one for promissory estoppel (Amended Complaint, ¶¶39-42).[8]  Because Plaintiffs cannot meet the essential elements of their claim for promissory estoppel, it must be summarily dismissed.

The gravamen of Plaintiffs' promissory estoppel claim is as follows:  Bishop Blackwell allegedly "promised" someone that he would execute a mortgage on the Mega Church property in favor of Omega Paving, which would then be assigned to RAM Group.  (Amended Complaint, ¶40).  Plaintiffs further allege that Bishop Blackwell *expected* Mr. McMahan to rely on the alleged promise, and that Mr. McMahan did in fact rely, to his detriment, when he loaned the money to cover the download expenses <u>before</u> Bishop Blackwell executed said mortgage. (Id. at ¶¶41-42).

In order to prove their claim for promissory estoppel, Plaintiffs must establish:

(1) a promise, clear and unambiguous in its terms;

(2) reasonable and foreseeable reliance; <u>and</u>

---

[8]   Counts I, V, VII, VIII, IX, X, and XI of the Amended Complaint were not asserted against the Mega Church Defendants and therefore are not the subject of this Motion for Summary Judgment.  As for the remaining Counts, on August 31, 2006, Plaintiffs filed a Motion to Dismiss (Document 59), contemporaneously with and incorporating by reference to their Response to the Court's Show Cause Order (Document 58).  Plaintiffs' Motion requested that Counts II, IV, and VI of their Amended Complaint (Document 46) be dismissed.  Specifically, Plaintiffs stated: "Plaintiffs hereby retain only Count III of the Amended Complaint and intend to continue to prosecute that claim [as against the Mega Church Defendants]."  On November 14, 2006, Magistrate Spaulding issued a Report and Recommendation (Document 80), recommending that Plaintiffs' Motion to Dismiss be granted and that Counts II, IV, and VI of Plaintiffs' Amended Complaint be dismissed.  The Mega Church Defendants hereby respectfully reserve their right to file an additional motion for summary judgment should the Court not accept Magistrate Judge Spaulding's Report and Recommendation recommending the dismissal of Counts II, IV, and VI of Plaintiffs' Amended Complaint.

(3) injury resulting from the reliance.

*The Andersons, Inc. v. Consol, Inc.,* 185 F. Supp. 2d 833, 839 (N.D. Oh. 2002).  Because RAM Group (through Mr. McMahan) is the only party that loaned the money to cover the download expenses, it is the only Plaintiff with standing to bring the promissory estoppel claim. Accordingly, in order for the claim to survive summary judgment, Plaintiffs must establish the link between a promise made by Bishop Blackwell to Mr. McMahan, upon which RAM Group (through Mr. McMahan) detrimentally relied.

Bishop Blackwell never made a promise to execute a mortgage on the Mega Church property to Mr. McMahan.  Mr. McMahan's own deposition testimony (taken during the Cuyahoga County Common Pleas action which the parties have stipulated may be used in this case) reveals that he did not have any conversations with Bishop Blackwell about executing a mortgage until after he released RAM Group's funds to cover the download expenses:

> Q.     Prior to sitting in this room today, you never actually met [Bishop Blackwell].  Is that right?
>
> A.     That's correct.
>
> Q.     You never corresponded with him or anyone from his church?
>
> A.     No.
>
> <div align="center">* * *</div>
>
> Q.     . . . You never spoke with the Bishop about signing a mortgage.  Correct?
>
> A.     I only spoke -- I've only spoken to the Bishop one time in my life.  And that was when I discovered that he had not signed the mortgage.

(McMahan Dep., p. 25, ln. 16-21; and p. 49, ln. 21-25).

Case 6:06-cv-00248-JA-KRS   Document 83   Filed 11/22/06   Page 14 of 22 PageID 489

Additional sworn testimony on this issue, given by Bishop Blackwell during his deposition in the Cuyahoga County Court of Common Pleas action, should also be taken into account:

Q.      Did you know at the time who [Mr. McMahan] was?  Did Mr. Settles tell you who he was?

A.      I never recognized Mr. McMahan's name until our call.

Q.      I see.  And when was that call?

A.      About a year after this transaction.

Q.      And what happened in that telephone call?

A.      My sense was that Tom Settles was under the gun to produce.  He was not producing, as we all know.  I was told that Mr. McMahan asked for the file, by which he had the collateral in the file so that he could act upon it.  When he got the file, it was not there.  So Tom Settles called, put us together to talk about that.  I believe my conversation, basically, was "Mr. McMahan, I can't help you."

You know, <u>I knew nothing of -- that was the first time I knew that we were expected to perfect the document, I had never, ever been contacted about the title company, signing a mortgage over, nothing by the lawyers that we had discussed here today, by the lawyer in Independence, whoever that was, by no one.</u>  The first time I heard that that was expected of me was when we talked -- my one and only time in conversation with Mr. McMahan.

                                        * * *

Q.      [A]t that time what did you perceive Mr. McMahan's reaction to be when you told him you didn't know anything about it?

A.      Well, he was, obviously, stunned, that nothing had been done to his anticipation.  It was brand new to me.  And certainly I wasn't going to sign anything a year later.  It made no sense to me, you know.  We hadn't received any money.  Nothing.  So why in the world would I after the fact sign a document a year later.

14

(Blackwell Dep., p. 31, ln. 14-25, p. 32, ln. 1-4, 11-19) (emphasis added).

Plaintiffs contend that Bishop Blackwell "derivatively" made a promise to "Richard McMahan and others" to execute a mortgage. (Plaintiffs' Response to Show Cause Order (Document 58), p. 4, Section II(C)(i)) (emphasis added). In order for Plaintiffs' promissory estoppel claim to survive, however, Bishop Blackwell must have made a clear and unambiguous promise to Mr. McMahan/RAM Group – the only party to have suffered the injury alleged. Mr. McMahan and Bishop Blackwell's sworn testimony makes it clear that such an exchange did not occur prior to RAM Group loaning nearly half a million dollars.

Plaintiffs' argument that Bishop Blackwell made this promise to "others" is equally unpersuasive. Should Plaintiffs suggest that Bishop Blackwell allegedly made this promise to Mr. Settles (Omega Paving), the following sworn testimony given by Mr. Settles completely refutes that assertion:

> Q.    . . . My next question is when you were talking to Bishop Blackwell in connection with this transaction, did you ever say to him "I'm going to need you to sign a mortgage on behalf of Mega Church" --
>
> A.    No.
>
> Q.    -- "in favor of RAM Group or Mr. McMahan"?
>
> A.    No, I never asked him.
>
> Q.    Did Bishop Blackwell ever promise you that he would sign a mortgage document to facilitate the transaction?
>
> A.    No. Mr. Wilson handled this transaction with Mr. Bauer. I was not the one that did that.
>
> Q.    So the answer is no, he never made a promise to you that he would sign a mortgage document in connection with the transaction, is that true?
>
> A.    Yes, it is.

(Settles Dep., p. 161, ln. 18-p. 162, ln. 9) (emphasis added).   Since Mr. Settles admits that he never discussed the requirement of a mortgage with Bishop Blackwell, the promissory estoppel claim cannot survive if Plaintiffs contend that the alleged promise to execute a mortgage came to Mr. McMahan by way of Mr. Settles.

And so it seems that Plaintiffs' entire case as to its promissory estoppel claim against the Mega Church Defendants hangs on the recollection of Mr. Wilson.   Mr. Wilson, acting on behalf of Omega Paving at the time, admitted that his role in facilitating the download transaction was purely "administrative in nature."   (*See* Affidavit of Mr. Wilson, ¶3, "Wilson Aff." attached to Plaintiffs' Response to Show Cause Order as Exhibit I, and attached hereto as Exhibit N).   Upon examination, Mr. Wilson explained:

> A.    I wasn't a principal in the negotiation.  I wasn't requiring or
> providing or designing or creating anything.  I was just an
> interlocutory in the process.

(*See* Deposition of Stephen R. Wilson, p. 53, ln. 24-p. 54, ln. 2, "Wilson Dep." attached hereto as Exhibit O).[9]   During his deposition, he also reaffirmed his statement from his Affidavit that "at this juncture, to the best of my knowledge, negotiations have matured and oral agreements have been reached by the parties, inclusive of Mr. Settles, Mr. McMahan, Mr. DeLangy [sic], and Bishop Blackwell."   (Id. at p. 54, ln. 25, p. 55, ln. 1-6; *see also*, Wilson Aff., ¶3).

Mr. Wilson claims that on Friday, July 25, 2003, he had a several telephone conversations with Bishop Blackwell, wherein Bishop Blackwell promised to execute a mortgage the <u>following Monday</u>, *i.e.*, July 28, 2003.  Whether or not these calls actually occurred (since Plaintiffs' counsel has yet to produce any telephone invoices and Bishop Blackwell denies ever speaking with Mr. Wilson) is an issue in dispute.  However, even assuming, *arguendo*, that

---

[9]   A certified copy of the transcript from Mr. Wilson's deposition has been filed with the Court.  For ease of reference, a condensed version of the transcript has been reproduced and is attached hereto as Exhibit O.

such telephone conversations did occur, the alleged promise made does not support Plaintiffs' promissory estoppel claim.

Mr. Wilson gave the following testimony regarding his purported conversation with Bishop Blackwell on Friday, July 25, 2003:

> Q.   So as you sit here today can you tell me what alleged promise Dr. Blackwell made to you that you may have relied upon in connection with this transaction?
>
> A.   That he would go to the title company, execute the deed that Monday.
>
> Q.   That was the promise he made to you?
>
> A.   That was my understanding.
>
> Q.   And you're certain that he made that statement to you?
>
> A.   Yes.
>
> Q.   And that's what you reported back to Mr. Bauer?
>
> A.   Yes.

(Wilson Dep., p. 66, ln. 21-p. 67, ln. 9).

Assuming the above statements made by Mr. Wilson to be true, Plaintiffs still do not achieve their desired result. Mr. Wilson claims that he relayed, via facsimile, Bishop Blackwell's purported promise to Mr. Bauer, attorney for Mr. McMahan, that same day. (Wilson Aff., ¶8; Wilson Dep., p. 57, ln. 10-17).

Mr. Bauer, however, has a different story to tell. Mr. Bauer states, in his sworn affidavit, that "On July 25, 2003, I was advised by Steve Wilson that Dr. Luther J. Blackwell, Jr. as Pastor and President of the Mega Church, was en route to the title company to sign the mortgage." (Affidavit of Kirk T. Bauer, ¶13,"Bauer Aff." attached hereto as Exhibit P). Mr. Bauer then stated: "Based upon such representation, my client released the loan proceeds." (Id.).

His client released the loan proceeds -- not because of any promise made by Bishop Blackwell, but because Mr. Bauer told Mr. McMahan that the mortgage deed was allegedly being signed that same day. *That* is the promise upon which Mr. McMahan relied when he transferred the $480,000 to cover the download expenses to Georgia REAL's account on Friday, July 25, 2003.

Plaintiffs' version of the events does not amount to a claim for promissory estoppel against the Mega Church Defendants. *Even if* Bishop Blackwell promised to execute a mortgage in favor of RAM -- a promise which Bishop Blackwell wholeheartedly denies making -- his promise to Mr. Wilson (the only person to testify to speaking directly with Bishop Blackwell on this issue) was allegedly to do so on Monday, July 28, 2003, not Friday, July 25, 2003. Whatever the reason for the breakdown in communication between Messrs. Wilson, Bauer, and McMahan, it has absolutely nothing to do with Bishop Blackwell. As a matter of law, the conversations and promises exchanged between those individuals cannot serve as the basis for Plaintiffs' promissory estoppel claim against the Mega Church Defendants. *See Oliver Design Group, Inc. v. Allen-Bradley Co.*, 2000 Ohio App. LEXIS 753, *22-24 (8th Dist., March 2, 2000) (affirming the trial count's decision to grant summary judgment against plaintiff's promissory estoppel claim, on the basis that there was no link whereby representations made to the plaintiff by a third party could be imputed to the defendant).[10]  Accordingly, Mr. McMahan's release of the funds could not have been done in reliance upon Bishop Blackwell's promise, since the release of funds occurred *before* the execution of any mortgage was even allegedly to occur.

---

[10]  A copy of this decision is attached hereto as Exhibit Q.

**C.   Plaintiffs have no physical evidence of Bishop Blackwell's purported promise to execute a mortgage.**

Plaintiffs cannot cite to one physical piece of evidence wherein Bishop Blackwell clearly and unambiguously promised to execute a mortgage on the Mega Church property in favor of RAM Group.  That is because such documentation does not exist.

Moreover, Plaintiffs have failed to produce any physical evidence establishing that the unexecuted, undated[11] "Mortgage Deed" (attached to their Response to the Court's Show Cause Order as Exhibit F, and attached hereto as Exhibit R) was even delivered to Bishop Blackwell or anyone authorized to act on his behalf.

In support of their claim, Plaintiffs will likely cite to various letters or other documents signed by Bishop Blackwell, all of which have been attached to pleadings and/or motions previously filed with the Court at some point in this litigation.  However, in *none* of those documents did Bishop Blackwell clearly and unambiguously make the promise alleged, *i.e.*, to execute a mortgage on his church's property.  As a matter of law, after-the-fact inferences or suppositions made from written documents do not satisfy the elements of a promissory estoppel claim.  *See Casillas v. Stinchcomb*, 2005-Ohio-4019, 2005 Ohio App. LEXIS 3669, *6-8 (6th Dist., July 8, 2005) (affirming the lower court's decision dismissing plaintiff's promissory estoppel claim on the basis that the written provision plaintiff relied upon was vague and ambiguous).[12]

---

[11]  Indeed, the only date appearing on the "Mortgage Deed" is a facsimile transmittal date of October 7, 2004 -- more than one year after the document was allegedly to be executed.

[12]  A copy of this decision is attached hereto as Exhibit S.

**D.    The Court need not enforce Plaintiffs' claim against the Mega Church Defendants in order to avoid injustice.**

Finally, in *Talley v. Teamsters, Chauffeurs, Warehousemen & Helpers, Local No. 377*, 48 Ohio St.2d 142, 146, 357 N.E.2d 44, 47 (1976), the Ohio Supreme Court, in adopting the doctrine of promissory estoppel set forth in the *Restatement of the Law 2d, Contracts*, stated

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding <u>if injustice can be avoided only by the enforcement of the promise.</u> (emphasis added).

In the instant case, not only are Plaintiffs unable to establish the essential elements of their promissory estoppel claim, they are also unable to satisfy the requirement that "injustice can [only] be avoided" by enforcing Bishop Blackwell's alleged promise to sign a mortgage. Plaintiffs RAM Group and Mr. McMahan received a judgment in the Volusia County Suit for the money extended to cover the expenses of the download. It is clear, therefore, that there would be no injustice if the claim against the Mega Church Defendants was dismissed, since Plaintiffs have already secured a remedy for the injury they allege.

There being no legal support for Plaintiffs' promissory estoppel claim, it fails as a matter of law, and should be summarily dismissed. [13]

## CONCLUSION

Summary judgment should be awarded in favor of the Mega Church Defendants on two grounds. First, Plaintiffs have already received a judgment awarding them the damages they seek from the Mega Church Defendants. Allowing them to proceed with their claim to

---

[13]    Should the Court determine that Florida law governs the dispute instead of Ohio law; the result would be the same. Under Florida law, a claim for promissory estoppel requires: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding <u>if injustice can be avoided only by enforcement of the promise</u>. The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice." *Revlon Grp. Inc. v. LJS Realty, Inc.*, 579 So. 2d 365, 367-68 (Fla. 4th DCA 1991) (emphasis added). Therefore, it is of no consequence whether the Court applies Ohio or Florida law -- Plaintiffs' claim fails either way.

recover the money loaned by RAM Group for the download expenses would be an inequitable double recovery.  Second, Plaintiffs have failed to establish the essential elements of their claim for promissory estoppel.  They have failed to establish evidence that Bishop Blackwell made a clear and unambiguous promise, which he expected to induce action or forbearance, to an individual who, in reliance of that same promise, acted to his/her detriment.  Consequently, as there remain no material issues of fact and the Mega Church Defendants are entitled to judgment as a matter of law, this Court should enter summary judgment in favor of the Mega Church Defendants on Count III of Plaintiffs' Amended Complaint.

> Respectfully submitted,
>
> *s/ Timothy J. Downing*
> Charles R. Olsavsky (Florida Bar #710008)
> Timothy J. Downing (Ohio Bar #0042396)
> Anne M. Klepach (Ohio Bar #0076400)
> ULMER & BERNE LLP
> 1660 West 2nd Street, Suite 1100
> Cleveland, Ohio 44113-1448
> Tel. 216.583.7000
> Fax. 216.583.7001
> colsavsky@ulmer.com
> tdowning@ulmer.com
> aklepach@ulmer.com
>
> Attorneys for Defendants Mega Church, Inc. and Bishop Luther J. Blackwell, Jr.
>
> and
>
> Kenneth E. Keechl, Esq. (Fla. Bar #699519)
> 612 N.E. 26th Street
> Wilton Manors, FL 33306
> Tel. 954.567.1734
> Fax 954.567.1283
> Ken@KenKeechlLaw.com
>
> Co-counsel for Defendants Mega Church, Inc. and Bishop Luther J. Blackwell, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2006, I electronically filed the foregoing Defendants Mega Church, Inc. and Bishop Luther J. Blackwell, Jr.'s Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF system.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF counsel and parties.

<div style="margin-left:40%">

_s/ Anne M. Klepach_____
One of the attorneys for
Defendants MEGA Church, Inc. and
Bishop Luther J. Blackwell, Jr.

</div>

25304-0002
197269.1