IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

CASE NO.: CV05555218

RAM GROUP, INC.,                    )
                                    )
            Plaintiff(s)            )        CONDENSED
vs.                                 )
                                    )
GEORGIA REAL ENTERPRISES,           )
INC., et al,                        )
                                    )
            Defendant(s).           )

DEPOSITION OF LUTHER JAMES BLACKWELL, JR.

DATE:             Wednesday, March 23, 2005

TIME:             4:05 p.m.

PLACE:            55 SE Osceola Street, Suite 201
                  Stuart, Florida
TAKEN BY:         W. Vincent Rakestraw, Esquire
REPORTER:         MARGARET F. RIDDLE, RDR, CRR, Notary
                  Public of State of Florida at Large

APPEARANCES:

FOR PLAINTIFF:    W. VINCENT RAKESTRAW, ESQUIRE
                  4930 Reed Road
                  Columbus, Ohio  43220

FOR DEFENDANT:    ULMER & BERNE, LLP
                  Suite 900
                  1300 E. Ninth Street
                  Cleveland, Ohio  44114-1583
                  by Timothy J. Downing, Esquire

ALSO PRESENT:     Richard A. McMahan

DEFENDANT'S
EXHIBIT
A

Page 2

I N D E X

EXAMINATION                                        PAGE
LUTHER JAMES BLACKWELL, JR. ............... 3
DIRECT EXAMINATION Q.  (By Mr. Rakestraw)    3
             - - -
PLAINTIFF EXHIBITS
EXHIBIT 1   Appraisal ....................... 7
EXHIBIT 2   Purchase and Right of ........... 16
      Use Agreement
EXHIBIT 3   Partners Agreement .............. 23
EXHIBIT 4   October 22, 2003 Letter ......... 25
      to Pastor Feaster
EXHIBIT 5   November 22, 2004 letter ....... 27
      from Mr. Settles
EXHIBIT 6   July 25, 2003 Letter to ......... 30
      Mr. McMahan
EXHIBIT 7   Mortgage Deed ................... 32

Page 3

1   AND THEREUPON,
2              LUTHER JAMES BLACKWELL, JR.,
3   called as a witness on behalf of the Plaintiff herein,
4   after having been first duly affirmed, was examined and
5   testified as follows:
6          DIRECT EXAMINATION
7       Q.  (BY MR. RAKESTRAW)  My name's Vince Rakestraw.
8   I'm from Columbus.  You already know that.
9       A.  Yes, sir.
10      Q.  I'm not going to ask you anything as a trick
11  or -- if you feel that the question is inappropriate, then
12  stop and I'll probably withdraw it and ask it another way.
13  Or if Tim objects, we'll try to work it out.
14      A.  Yes, sir.
15      Q.  As with everyone, you have to verbalize your yes
16  or no or your narrative, and just tell me if you're
17  uncomfortable with a question or you want to stop or you
18  want to take a break.
19          Would you state your full name for the record.
20      A.  Luther James Blackwell, Jr.
21      Q.  And where do you live, Mr. Blackwell?
22      A.  I live part-time in Ohio, part-time in Arizona.
23      Q.  Now, we better explore that.  So what part do you
24  live --
25      A.  Ohio address is 921 Chinaberry Circle South,

Page 4

1   Macedonia, Ohio.  44056.
2       Q.  And where do you live in Arizona?
3       A.  I live in Scottsdale, Arizona.
4       Q.  And do you have an address there?
5       A.  14328 East Charter Oak Drive, Scottsdale, AZ
6   85259.
7       Q.  And where are you a resident, Ohio or Arizona?
8       A.  Ohio.
9       Q.  So you're an Ohio resident?
10      A.  And Arizona.  That's what I just gave to you.
11      Q.  But formally choose which one?
12      A.  Officially, I'm Arizona.
13      Q.  I see.  And do I refer to you as Bishop?
14      A.  You can.
15      Q.  Is that -- what's the correct way to --
16      A.  Bishop or doctor.  Whichever you choose.
17      Q.  Let's use Doctor.
18      A.  Okay, sir.
19      Q.  We already had one Doctor.  So it keeps the court
20  reporter consistent.
21      A.  Okay.
22      Q.  Where were you ordained?
23      A.  I was ordained in Ohio, about 19, oh, 56 or so.
24      Q.  And can you go through the churches that you've
25  ministered from that time?

Page 5

1       A.  Churches that I've pastored?
2       Q.  Yes.
3       A.  I've pastored organization called House of
4   Prayer, United Holy Church in Warren, Ohio; and then New
5   Life Fellowship, Cortland, Ohio.  And then to Mega Church,
6   Cleveland, Ohio.
7       Q.  So in your career so far you've only had three
8   churches?
9       A.  Three churches.  I was in a co-situation with a
10  Temple of Deliverance in Warren, Ohio.  Co meaning I shared
11  responsibilities with another.
12      Q.  What years were you at these respective churches?
13      A.  I could not tell you exactly the years.
14      Q.  Approximately?
15      A.  House of Prayer I began pastoring in 1966.  And I
16  pastored that until '72.  Temple of Deliverance was about
17  1972 to 1980.  And then New Life Fellowship from 1980 to
18  about 1993 or so.  And I founded Mega Church 1991 until
19  present.
20      Q.  When you say you founded -- found, you were the
21  founder of the church.
22      A.  I'm the founder of the church.
23      Q.  I see.  So tell me how that happened.
24      A.  At New Life Fellowship individuals started coming
25  to us from Cleveland, Ohio.  We had television ministry, we

2 (Pages 2 to 5)

ATLANTIC REPORTING
(800) 336-0050

Page 6

1  had radio ministry, so we were being exposed to all of
2  northeastern Ohio. People hearing us by way of radio and
3  television decided to make the journey from Cleveland.
4      After a while, our Cleveland population almost
5  overrode the local area. And so by that implication, we
6  decided to go ahead and do a satellite-type ministry in
7  Cleveland, Ohio. So we went in, did a couple of crusades.
8  And those crusades, we had 1,500, 2,000 people. So it kind
9  of told us that there was a market, quote, unquote, for us.
10     And so we started Friday night services at
11 Lutheran East for about three, four months. Then we moved
12 down -- I closed the church at Cortland for five weeks,
13 brought them up to Cleveland to begin -- to launch Mega
14 Church. And so our -- after five weeks, we sent them back
15 to Cortland and started with this nucleus of people that
16 was about 65 charter members.
17     And then from there in six months we purchased
18 our present facility and paid -- paid for it in a
19 year-and-a-half.
20     Q. And what year was that?
21     A. That would have been 1993, early.
22     Q. And do I have the name correct, Mega Church,
23 Incorporated, a not-for-profit corporation? Is that the --
24     A. We are Mega Church, Incorporated, not-for-profit
25 corporation.

Page 7

1      Q. So the pleading is correct as to the name of the
2  church?
3      A. Mega Church, yes.
4      Q. How large is your church now?
5      A. Approximately, 1,400 families.
6      Q. And you've owned the church since 1993?
7      A. Yes.
8      Q. As Mega Church, Incorporated.
9      A. Yes.
10     MR. RAKESTRAW: Tim, I'm not going to introduce
11 that. I'm just going to show him that and ask him if
12 that's the relative value of his church, you know,
13 from his opinion or if he thinks it's -- that
14 appraisal was made by Mr. Bauer for -- or I'll put it
15 in if you think it's beneficial. Why don't we just
16 mark it.
17     MR. DOWNING: I just would like a copy of it.
18     MR. RAKESTRAW: Let me mark it. That way we've
19 got it in already. Would you mark this, I think to be
20 consistent, Blackwell A.
21     (Blackwell Exhibit 1 marked for identification.)
22     Q. (BY MR. RAKESTRAW) Doctor, I'm going to hand you
23 a portion of an appraisal by Statewide Appraisal Services
24 dated July 19th, 2003. It's a letter that values the
25 church roughly at a million, 650,000. And my question to

Page 8

1  you, is that about the value of the church?
2      A. Well, not really knowing the world of appraisers,
3  I would say it's probably slightly more, being that we are
4  constantly upgrading, remodeling, renovating, adding to, et
5  cetera. But that's a fair assessment.
6      Q. Have you ever entertained the idea of selling the
7  church and moving to bigger quarters?
8      A. Entertained?
9      Q. I mean, you know --
10     A. Yes, we're always entertaining expansion.
11     Q. So as part of that expansion, have you tried to
12 market the present church and look for another one?
13     A. No. We have not tried to market the church.
14     Q. Would you sell the church?
15     A. I would have sold the church by those who came to
16 us and asked to buy from us, which was Anchored
17 Victoriously in Christ.
18     Q. I see.
19     A. And they came, made an offer. We accepted. They
20 were not able to deliver. And so since that time, we have
21 not entertained the idea of selling the church again.
22     Q. And what was their offer?
23     A. Their offer was $5 million for our church
24 facility, our day care, and all the contents therein.
25     Q. Meaning that you would have to start all over.

Page 9

1      A. No. Because our contract allowed us to stay in
2  the church -- it was to utilize it, debt-free for two
3  years. And in that -- at that time we were looking to
4  purchase land, and we were actively involved in that
5  acquisition. And so the way we had planned it is to make a
6  smooth transition between church and new facility on the --
7      Q. Makes a lot of sense. Are you still broadcasting
8  the church services?
9      A. Are we on the radio?
10     Q. Yes.
11     A. Yes, we are.
12     Q. Are you on television?
13     A. We are not on television. I'm on television
14 occasionally, when I choose to. But the church itself is
15 not.
16     Q. Would that be as a pastor or would that be --
17     A. It's as a host of Trinity Broadcasting Network.
18     Q. So you're just a -- I shouldn't say just. You
19 are a TV personality, you interview people, and it's a
20 Christian program. Is that correct?
21     A. Yes.
22     Q. How often do you do that?
23     A. At will.
24     Q. So once a month?
25     A. No. I haven't done it for a couple years.

3 (Pages 6 to 9)

## Page 10

1   Q.  Oh, I see.  Are you well-known nationally?
2   A.  You're asking me to make an evaluation of myself.
3   Q.  Of course.
4   A.  It has been said.
5   Q.  It's going to get worse.
6   A.  It has been said.  It has been said that I am,
7 yes.
8   Q.  But you're known nationally in church circles
9 and --
10   A.  I have had national platforms, international
11 platforms, yes.
12   Q.  Can you tell me about those?
13   A.  Well, I don't know exactly what to tell you.  I
14 mean, I have spoken with and shared pulpit with such as
15 Oral Roberts, Jack Hayford, presently a T.D. Jakes, who
16 does his meetings from stadiums.  And I share
17 responsibilities with and for him.  I speak in his 30,000
18 member church.  And many churches on that level.  Yes.
19   Q.  Well, it's the lawyer's test, do you speak more
20 than 50 miles away from home?
21   A.  Yes, I do.
22   Q.  And you do that on a regular basis?
23   A.  I do it as regularly as I choose.
24   Q.  Do you write?  Do you --
25   A.  I have books, yes.

## Page 11

1   Q.  Yes.  What have you written?
2   A.  I have written a book called -- my first book was
3 Filled to Praise Him.  Second book was called Power to Get
4 Wealth.  Third book was called Heritage of the Black
5 Believer.
6   Q.  Interesting.  And those books are still in print?
7   A.  They're still in print, they're still available
8 except Filled to Praise Him, which is not.  The other two
9 are.
10   Q.  How about Internet, are you doing anything on the
11 net?
12   A.  Our church is advertised on the Internet.
13   Q.  So you have a web site.
14   A.  We have a web site.
15   Q.  Do you get regular hits, for lack of a better
16 word?
17   A.  I don't know.  Because I don't check.
18   Q.  God, only did that one day, put it up, got 450
19 hits and decided that's not for me.  But --
20   A.  I do not know.  I've never followed through with
21 that.
22   Q.  It's fair to say that you're nationally known,
23 published author, certainly in Christian circles.  And how
24 about internationally?
25   A.  Yes.

## Page 12

1   Q.  How are you known internationally?
2   A.  Well, I've spoken through South America, Europe,
3 the Vatican, places of that magnitude.
4   Q.  Interesting.  What's your educational background?
5   A.  I have a Bachelor's in music and education from
6 Baldwin-Wallace College, Berea, Ohio.  And my post-grad is
7 from Mission College in California.  That consists of a
8 Master's, two Ph.D.'s.
9   Q.  What's are your instrument?
10   A.  My major in college was percussion.  My minor was
11 voice and piano.
12   Q.  Do you still play and sing?
13   A.  I do -- well, I sing congregationally, not as a
14 solo.
15   Q.  Interesting.
16   A.  Yes.
17   Q.  And what about your undergraduate, both
18 degrees -- well, excuse me.  Your undergrad is
19 Baldwin-Wallace and your Doctor's --
20   A.  Vision College.  California.
21   Q.  Vision.  And you said you have two.  Both from
22 Vision?
23   A.  Yes.
24   Q.  How about -- where did you grow up?
25   A.  I grew up in Warren, Ohio, went to school in

## Page 13

1 Warren, graduated from Warren High School, 1960.
2   Q.  Okay.
3   A.  Went on from there to BW, graduated from there
4 '64.
5   Q.  Your family still live around Warren?
6   A.  Family, meaning my children?
7   Q.  Uh-huh.
8   A.  Yes.  My children are all within 20 minutes of my
9 home.
10   Q.  Did you marry a Warren girl?
11   A.  No.  I married a St. Louis girl.  Our anniversary
12 is coming up, 36 years.
13   Q.  You do get around, more than 50 miles.
14   I want to hand you -- and I'd like to get on
15 point here, although I enjoyed talking with you -- this
16 security agreement marked -- it's Plaintiff's, it's -- I
17 don't know how it's marked --
18   MR. DOWNING:  I believe it's McMahan Exhibit A.
19   Q.  (BY MR. RAKESTRAW)  McMahan Exhibit A?
20   MR. DOWNING:  Yes.
21   Q.  (BY MR. RAKESTRAW)  Would you look at that?
22   A.  I'm familiar with it, yes, sir.
23   Q.  And did you sign that?  Is that your signature?
24   A.  This is, in fact, my signature, yes.
25   Q.  What was your feeling when you signed that?  I

4 (Pages 10 to 13)

Page 14

1 mean, what did you -- what was -- did you feel was the
2 obligation of the church when you signed that?
3     A.  Well, this agreement is secondary to why I signed
4 it. Primary reason was we had a buyer, as I mentioned,
5 Anchored Victoriously in Christ, who came to purchase our
6 property for $5 million. The purchaser turned me over to
7 Thomas Settles who I thought at the time was representing
8 her to finalize the deal.
9         Thomas Settles, in fact, said that he had
10 something to present that if we were to sign this security
11 agreement, that it would help the purchaser facilitate the
12 sale, therefore, giving us our money in an accelerated
13 fashion. So that's the purpose of this document.
14     Q.  I may have asked this. What period of time was
15 this sale, or the offer that you had? Are you talking
16 about the same offer, when you say sale?
17     A.  Anchored Victoriously in Christ --
18     Q.  Yes.
19     A.  -- came to us --
20     Q.  And that's the only --
21     A.  That's the only sale we had. We did not
22 advertise.
23     Q.  And when was it?
24     A.  Probably about two years ago.
25     Q.  So in the '03 period that we've been talking

Page 15

1 about all day.
2     A.  Yes.  Yes.
3     Q.  Did you know Mr. Settles prior to that?
4     A.  Never.
5     Q.  And how did it happen that he was going to handle
6 the sale?
7     A.  As I said, the purchaser --
8     Q.  Purchaser --
9     A.  -- came to me -- or came to us. We made the
10 agreement. Once we settled upon the agreement, he -- or
11 she turned us over to him and -- to represent her in
12 finalizing the deal, I thought.
13     Q.  And who was she?
14     A.  Her name is Iyesha, I-Y-E-S-H-A, initial D.,
15 initial L. Feaster, F-E-A-S-T-E-R, pastor of Anchored
16 Victoriously in Christ. Incorporated, 501(c)(3) non-profit
17 organization.
18     Q.  Thanks a lot. Was there an actual written real
19 estate purchase offer?
20     A.  There is a purchase agreement for the church and
21 for the day care, yes.
22     Q.  Is that something you could furnish?
23         MR. DOWNING: I have it right here. Just let the
24     record reflect that I am providing counsel a copy of
25     the purchase and right of use agreement that

Page 16

1 Dr. Blackwell has been testifying about.
2         MR. RAKESTRAW:  Would you please mark that
3 Blackwell 2.
4         (Blackwell Exhibit 2 marked for identification.)
5     Q.  (BY MR. RAKESTRAW)  Doctor, I'm handing you this
6 Purchase and the Right of Use Agreement, and would ask you
7 to look it over and identify it.
8     A.  Yes, sir.
9     Q.  Would you please turn to the signature page and
10 identify your signature.
11     A.  Yes, sir. All signatures are mine.
12     Q.  Excellent. What was your understanding of the
13 terms of the sale? We've already -- you've already said
14 $5 million, which gets my attention. And --
15     A.  What was my understanding?
16     Q.  You had a right to use the church for two years?
17     A.  Everything that was written here.
18     Q.  Yes.
19     A.  Is my understanding because I wrote it.
20     Q.  I see. And then the purchaser engaged and paid
21 Mr. Settles to negotiate or to --
22     A.  Well, I don't know what their arrangement was.
23 All I know is he contacted us and asked us about entering
24 into the security agreement that would give to us $550,000
25 that would help her to make purchase of -- to honor the

Page 17

1 contract that we had agreed upon.
2     Q.  And how was that going to help her?
3     A.  She spoke of some monies that were available to
4 her that Tom Settles, et al, were bringing together. My
5 interests were not those funds, but what we had agreed upon
6 through this agreement.
7     Q.  Did you get the feeling that Mr. Settles may have
8 made this presentation to her and she was using that as a
9 way to purchase your church?
10     A.  I had a feeling that -- yes.
11     Q.  And how did she introduce Mr. Settles to you?
12     A.  Call this number to finalize this agreement.
13     Q.  So -- and did Mr. Settles call you?
14     A.  We called him to let him know that we had made
15 this agreement, and that she asked us to give him a call to
16 finalize it.
17     Q.  When you say finalized, does that mean arrange
18 for the financing --
19     A.  I suppose that that's what that meant. To
20 arrange for the financing. After all, we were looking for
21 money. So however that would come about.
22     Q.  Is that fair to say that he was their sole
23 representatives to consummate this sale?
24     A.  At the time I would have said that. Since then,
25 that has not been the case.

5 (Pages 14 to 17)

Page 18

1   Q.   Interesting.
2   A.   But at the time that was what my impression was.
3   Q.   And what's the date of that agreement?
4   A.   July 18, 2003.
5   Q.   So it's really actively contemporaneous with the
6   transaction we're talking about wherein Mr. McMahan lent
7   Georgia REAL 550,000.
8   A.   Yes.
9   Q.   So it's a few days before.  So you called
10  Mr. Settles.  Did you --
11  A.   I'm not sure I called him or he called us.
12  Anyhow --
13  Q.   You made contact.
14  A.   Yes.  There was a communication.  Pastor Feaster
15  gave to us a number or call him to contact us.  Somehow the
16  connection was made, yes.
17  Q.   And what did he say when you talked with him
18  originally?
19  A.   I don't remember the conversation, other than the
20  bottom line was that we want to help Pastor Feaster
21  purchase your church.
22  Q.   Okay.
23  A.   And this is how we can do it.  Basically.
24  Q.   And what did he -- how did he introduce the idea
25  to you?  I mean, what did he say?

Page 19

1   A.   The idea was that if we can take a portion of
2   your church and collateralize it in some manner, maybe we
3   can make this happen kind of thing.  I don't really know
4   the conversation.  That was two years ago, and I don't know
5   what he said exactly.
6   Q.   I understand.  Did he tell you anything more
7   about the transaction -- the transaction?
8   A.   No.  I wasn't interested in the transaction.  I
9   was interested in selling my church.  And I didn't care
10  about what was out there, other than she had said that we
11  have a way to purchase and Tom Settles will make that
12  arrangement.
13  Q.   Then what happened?
14  A.   Nothing.
15  Q.   So -- but we had to get to the collateralization.
16  How did Settles move on to that point?
17  A.   Well, he -- obviously, he sent me this document
18  that I signed.  Beyond this, nothing.
19  Q.   And he said that signing this documentation will
20  get the purchaser money or what was that --
21  A.   I don't know what he said.  It was just all in
22  the process of the end result is you're going to get
23  $5 million.  The contract is going to be agreed with --
24  agreed upon -- the contract is going to be fulfilled that
25  Pastor Iyesha entered into with you.  That was the bottom

Page 20

1   line for me.
2   Q.   So that was your motivation to --
3   A.   That was my motivation, to help her to purchase
4   our church.  Only motivation.
5   Q.   I understand.  And he said to do that -- did he
6   send out the -- the security agreement?
7   A.   He faxed it.  Yes, sir.
8   Q.   Did he draft it?  Or do you know?
9   A.   I can't tell you whether he did or not.
10  Q.   This security agreement came flying in on a fax,
11  right?
12  A.   Well, it's here.  It has my number on the top.
13  Q.   No.  I understand.
14  A.   It has Omega Paving.  So I mean he faxed the
15  document.
16  Q.   I understand.
17  A.   Yes.
18  Q.   Then did he just ask you to sign it and date it
19  at that time?
20  A.   Well, based on the conversation that he
21  presupposed and set up, yes.
22  Q.   But he told you nothing else?
23  A.   He told me nothing about any deal.  I mean, I
24  wasn't interested in that, other than she would be helped
25  to purchase our church.

Page 21

1   Q.   Did you ever meet him?
2   A.   No -- you mean have I met him since?
3   Q.   Well, no --
4   A.   In the two years.  No, had never met him.
5   Q.   When did you meet him?
6   A.   Last summer.
7   Q.   And why did you meet him?
8   A.   Because I was in Atlanta for a T.D. Jakes
9   conference, and he knew I was coming.  He invited me to
10  lunch, and it was August of last year that I met him.
11  Q.   Did he tell you anything about the transaction
12  with the 550,000 and Georgia REAL at that time?
13  A.   No.  That was not our conversation.
14  Q.   So you've never really seen documents on that
15  or --
16  A.   From -- no.  By Georgia REAL and Omega Paving
17  you're saying?
18  Q.   Yes.
19  A.   No.  I haven't seen any documents from him other
20  than --
21  Q.   The documents being the ones we've put in the
22  record here, the note.  You have the security agreement.
23  A.   Right.  He said --
24  Q.   It's your testimony you haven't seen any
25  documents --

6 (Pages 18 to 21)

Page 22

1   A. Well, I don't know. It's two years.
2   Q. Yeah.
3   A. If he sent me something on fax --
4   Q. Yeah.
5   A. -- or something like that, I may have. But in
6  terms of something I could sink my teeth in and say --
7   Q. No, but when you met him, --
8   A. Oh.
9   Q. -- did he say anything about the transaction or
10  why the deal failed?
11   A. No. I know nothing about any deal. All I know
12  is we're selling our church. This lady's going to buy it.
13  He's going to help her to buy it.
14   Q. Yeah. I understand.
15   A. That's the bottom line.
16   Q. Did you read the security agreement?
17   A. Yes.
18   Q. And you were aware of the terms and the
19  obligation that you had to meet as to collateral?
20   A. I was aware that in order -- I was aware that in
21  signing this, $550,000 should be coming to me in some form
22  in order to help purchase this -- help the purchaser buy a
23  church.
24   Q. And you understood who you were in the agreement,
25  the debtor?

Page 23

1   A. Yes.
2   Q. And at that period of time you understood that
3  the secured party was Omega. Correct?
4   A. No. I did not understand that they were secured.
5   Q. Who did you -- yeah?
6   A. Because I knew that if they were secured, they
7  wouldn't be coming to me and asking me for my money or my
8  church.
9   Q. No. I understand. But you understood that they
10  were a party to this agreement.
11   A. I understood that they were the only party
12  representing her in the purchase of this agreement.
13   Q. I see.
14   A. Yes.
15   Q. Were you aware at the time that if you defaulted
16  that may obligate the church for 550,000?
17   A. No. Because that's not what this says. Or
18  that's not what I understood it to say.
19   Q. Okay. What were you aware of?
20   A. That I should be getting $550,000 in the release
21  of our collateral piece for consideration.
22   MR. RAKESTRAW: Could you mark this as Blackwell
23  3, please.
24   (Blackwell Exhibit 3 marked for identification.)
25   Q. (BY MR. RAKESTRAW) Handing you a document signed

Page 24

1  by Mr. Settles dated September 29th, '03. Can you identify
2  that? Have you ever seen that before?
3   A. No, sir.
4   Q. In the --
5   A. Not to my knowledge.
6   Q. Yeah. Take your time and read it. I don't want
7  to rush a question.
8   A. No, I've never seen anything that started with
9  Stephen R. Wilson.
10   Q. Did anyone ever talk to you about
11  $2 million being disbursed to the church?
12   A. Yes. Tom Settles mentioned that later in what he
13  would be willing to do if this came together.
14   Q. And did he discuss the commitment of collateral
15  as he does in this letter? Or this agreement, I should
16  say.
17   A. It would be the same as what is mentioned here,
18  the security agreement that I have the understanding.
19   Q. I see. So at that point was it your
20  understanding that -- are you still being assisted in the
21  sale? Are they still assisting, or has that disappeared?
22   A. No. We sent a letter to AVIC, which my attorney
23  has, that cancelled the whole deal after a little over a
24  year. We didn't think anything was coming to this. And so
25  we said, we're out of this, we're keeping our church, thank

Page 25

1  you, but no thank you.
2   MR. RAKESTRAW: Can you furnish us a copy? And
3  mark that Blackwell 4.
4   (Blackwell Exhibit 4 marked for identification.)
5   Q. (BY MR. RAKESTRAW) Doctor, would you please look
6  that letter over and identify it.
7   A. Yes. This is the letter that I sent to Pastor
8  Feaster negating our arrangement.
9   Q. And the date on that is --
10   A. October 22, 2003.
11   Q. And almost contemporaneously, Mr. Settles is
12  still saying 2 million to -- for the commitment. But you
13  didn't know of this at that time. Did he ever
14  communicate --
15   A. I've never seen that document.
16   Q. Did Mr. Settles communicate the 2 million to you
17  in any form?
18   A. Yes, he did.
19   Q. And how did he communicate it?
20   A. That in the perfecting of this arrangement that
21  he would graciously grant to the church or contribute to
22  the church $2 million.
23   Q. Did he say it was in return for your collateral
24  commitment?
25   A. No. Because we already had the purchase --

7 (Pages 22 to 25)

### Page 26

1    Q.  I understand that.
2    A.  And my thinking was he is gifting us $2 million
3  because we got the ballpark -- or made it possible that
4  this whole thing could flow.
5    Q.  Right.  By your commitment to --
6    A.  Yes.
7    Q.  -- collateralize the whole process.  So at that
8  point in time you thought that -- because you hadn't
9  cancelled the sale yet.
10    A.  No.
11    Q.  Soon to cancel it, but you haven't cancelled it
12  yet.
13    A.  Right.
14    Q.  And then he, around the 29th, September 29th, he
15  also was making statements that he would provide
16  $2 million in return for the collateral commitment?
17    A.  He was making that statement right up front.
18    Q.  Was he?
19    A.  He made that within 24 hours of this agreement.
20    Q.  Of your -- of your talking to him on the phone?
21    A.  Yes.  In that conversation he made that
22  agreement.
23    Q.  And that just kept rolling, every time he talked
24  to you, would he say, remember you got --
25    A.  I don't know every time.  I mean, that was an

### Page 27

1  understanding that he was giving.  But that was not my
2  concern.  I was just happy to get the money from the sale
3  of the property.  Done.
4    Q.  Right.  I understand.
5    A.  $2 million.  If you want to give us $2 million,
6  fine.  If you want to give us 12 million, fine.
7    Q.  Right.
8    A.  Just give me the money for this.  That's my
9  interest.
10    Q.  But he did verbalize that in appreciation for
11  your commitment?
12    A.  He did verbalize that Omega Paving would get
13  $2 million in some way.  In some manner, yes.
14    MR. RAKESTRAW:  Would you mark that Blackwell 5.
15    (Blackwell Exhibit 5 marked for identification.)
16    Q.  (BY MR. RAKESTRAW) I'm handing you a letter
17  dated November 22nd, 2004.  Would you look that over and
18  identify it if you can.
19    A.  Okay.
20    Q.  Have you seen that letter before?
21    A.  Yes.
22    Q.  And what --
23    A.  I believe he sent us this to guarantee Mega
24  Church would be released from any further obligation.
25    Q.  In other words, he -- he was sure that the grant

### Page 28

1  or the loan or whatever monies that were -- that was coming
2  from Mr. Barker was actually coming?
3    A.  Well, I didn't know anything about Mr. Barker.
4    Q.  I understand.
5    A.  Okay?
6    Q.  But did he reiterate that the 2 -- this was after
7  you had cancelled the sale.  Actually, it was, what, almost
8  a year afterwards.  Did he reiterate at that point in time
9  that he was going to give the church 2 million?
10    A.  No.
11    Q.  So your analysis of that letter meant that the
12  church was going to be released.
13    A.  Yes.  From any litigation actions --
14    Q.  And what --
15    A.  -- because by that time -- I can't be sure.  But
16  I think by that time we were beginning to get wind of
17  litigation or it being threatened with litigation, I
18  believe.  I can't be sure.  But that's the only reason that
19  the church would ask for some type of release is because we
20  were being threatened in some form.  Yes.
21    Q.  And the release would be from the commitment, the
22  collateral commitment, is that what you're seeking?
23    A.  The release would be from litigation of whatever
24  form.
25    Q.  Total release?

### Page 29

1    A.  Yes.  Whatever form it would come.
2    Q.  And at that point your lawyer was Inajo
3  Chappell -- Davis Chappell?
4    A.  I believe so.
5    Q.  Okay.
6    A.  November 22nd, yes, 2004, yes.
7    Q.  And has she been your counsel for a long time?
8    A.  She has been my counsel -- I wouldn't say for a
9  long time.  Long in terms of that we've utilized her in the
10  last five or six years.  But there was a gap there that we
11  did not use her for two or three years.
12    Q.  Is she a member of the church?
13    A.  No, she is not.
14    Q.  Well, she's a nice lady --
15    MR. RAKESTRAW:  Go off the record.
16    (Off-the-record discussion.)
17    A.  If you don't mind, I would like to see a copy of
18  that that you put before me from Thomas Settles, because
19  I'd like to read it for its accuracy.
20    Q.  (BY MR. RAKESTRAW) Go ahead.  Take it.
21    A.  Because I've never seen that before.
22    Q.  It's going to be in the record.
23    A.  I do note I'm not on here to sign it anywhere,
24  endorse it.
25    Q.  I understand that.  I just wanted to know if you

8 (Pages 26 to 29)

ATLANTIC REPORTING
(800) 336-0050

## Page 30

1 saw it.
2    A. My attorney would have seen it or had it if I
3 had.
4       MR. DOWNING: Should probably keep that with the
5 originals.
6       MR. RAKESTRAW: I think we're finished with all
7 those.
8       (Blackwell Exhibit 6 marked for identification.)
9       MR. RAKESTRAW: Can we go off the record.
10      (Recess taken at this time.)
11          - - -
12          CONTINUED DIRECT EXAMINATION
13    Q. (BY MR. RAKESTRAW) Can you identify that letter?
14    A. Apparently, it's a letter that I sent to --
15    Q. Is that your signature?
16    A. It is my signature to Mr. McMahan, July 25th,
17 2003, with a provisionary clause here.
18    Q. Why would you send that letter?
19    A. Most likely Tom Settles asked me to.
20    Q. And why would he ask you to?
21    A. I don't know. Other than possibly Mr. McMahan's
22 satisfaction or whatever. I don't know.
23    Q. In other words, to support the disbursement of --
24    A. Says Georgia REAL, Omega Paving transaction. So,
25 remember, I don't know any of these people.

## Page 31

1    Q. No. I understand.
2    A. So I'm not keen as to why he asked me.
3    Q. But it's your testimony that Tom Settles said, "I
4 need a letter to the attention of Mr. McMahan."
5    A. I'm sure that's the only reason I would draft it,
6 because I didn't know who Mr. McMahan was, otherwise.
7    Q. Did you know at the time who he was? Did
8 Mr. Settles tell you who he was?
9    A. I never recognized Mr. McMahan's name until our
10 call.
11    Q. I see. And when was that call?
12    A. About a year later after this transaction.
13    Q. And what happened in that telephone call?
14    A. My sense was that Tom Settles was under the gun
15 to produce. He was not producing, as we all know. I was
16 told that Mr. McMahan asked for the file, by which he had
17 the collateral in the file so that he could act upon it.
18 When he got the file, it was not there. So Tom Settles
19 called, put us together to talk about that. I believe my
20 conversation, basically, was, "Mr. McMahan, I can't help
21 you."
22       You know, I knew nothing of -- that was the first
23 time I knew that we were expected to perfect the document.
24 I had never, ever been contacted about the title company,
25 signing a mortgage over, nothing by the lawyers that we had

## Page 32

1 discussed here today, by the lawyer in Independence,
2 whoever that was, by no one. The first time I heard that
3 that was expected of me was when we talked -- my one and
4 only time in conversation with Mr. McMahan.
5    Q. Was Mr. Settles on the phone in the conversation?
6    A. He is the one who conferenced us, yes.
7    Q. So he conferenced you. He was still on the line?
8    A. He was still on the line.
9    Q. And you were talking?
10    A. Talking to Mr. McMahan.
11    Q. Yeah. At that time what did you perceive
12 Mr. McMahan's reaction to be when you told him you didn't
13 know anything about it?
14    A. Well, he was, obviously, stunned, that nothing
15 had been done to his anticipation. It was brand new to me.
16 And certainly I wasn't going to sign anything a year later.
17 It made no sense to me, you know. We hadn't received any
18 money. Nothing. So why in the world would I after the
19 fact sign a document a year later?
20       MR. RAKESTRAW: Would you mark that 7.
21       (Blackwell Exhibit 7 marked for identification.)
22    A. So that's kind of the way we ended our
23 conversation.
24    Q. (BY MR. RAKESTRAW) I'm going to hand you
25 Blackwell 7, and ask if you'd ever seen that.

## Page 33

1    A. Never in my life.
2    Q. It was not communicated to you or to the best of
3 your knowledge to anybody who represented you?
4    A. Never in my life -- my entire life.
5    Q. Okay. I'm going to hand you a couple of exhibits
6 that have been marked. And I don't think we've gone over
7 this yet. And this is -- how did you have the note,
8 DeLargy A. That's DeLargy A that I'm handing you. Would
9 you look that over. Have you seen that before?
10    A. Never in my life.
11    Q. Referring you to paragraph 3, what does that
12 paragraph say?
13    A. Said, "This note with interest is secured by a
14 mortgage in favor of said payee on property located at 3170
15 Scranton Road, Cleveland, Ohio, and shall be construed and
16 enforced according to the laws of the State of Florida,"
17 which is all incorrect, false, a lie.
18    Q. Is that the address of the church?
19    A. That is the church address.
20    Q. I think this was marked DeLargy C, the
21 assignment.
22       MR. DOWNING: This is McMahan Exhibit C.
23    Q. (BY MR. RAKESTRAW) Let me hand you that just for
24 a quick question. Do you recognize that document?
25    A. Never seen it in my life.

9 (Pages 30 to 33)

Page 34

1    Q. Do you recognize any of the names on there?
2    A. Not at all.
3       MR. RAKESTRAW: This is off the record.
4       (Off-the-record discussion.)
5    Q. (BY MR. RAKESTRAW) It's your testimony that you
6  never met or do not know Mr. Barker?
7    A. I never met or have never -- I have never seen
8  Mr. Barker. I have spoken with him since that time. But I
9  do not -- if he were to walk in this room, I would not know
10 who he is.
11   Q. When did you speak with him?
12   A. I can't give you any date.
13   Q. Approximate time?
14   A. I can't even give you an approximate.
15   Q. Time of year?
16   A. I'll tell you under what circumstance. Tom
17 Settles had called me regarding this -- can I call it
18 mystery money?
19   Q. Right.
20   A. And Pastor Feaster had made a statement that
21 implied that it was not Tom Settles' money, it was her
22 money, because all this was brought together by her. Tom
23 Settles, in order to disprove her, said I'll let you talk
24 to the source, which was Allen E. Barker. At that time he
25 contacted Barker, conferenced me in, and that's when I

Page 35

1  talked to him.
2       We're talking months down the road. Probably
3  almost a year later when all this began to surface.
4    Q. What was the summary of the conversation?
5    A. Allen Barker said -- let me think about --
6  summarizing that, no, it is not Pastor Feaster's money. It
7  was a project that he is doing, that he has obligated
8  himself to give Pastor Feaster a portion, as he had
9  committed himself to give Tom Settles a portion. So it was
10 kind of in support of Tom Settles. And that was when I met
11 Allen Barker, to prove the money, where it was coming from,
12 whose it is, et cetera.
13   Q. Did he ever identify his role in this acquisition
14 of money or distribution of money? I'm talking about
15 Barker now.
16   A. Barker is supposed to be the agent of these
17 funds.
18   Q. Right.
19   A. He's supposed to be the one that is making all
20 this happen. It's his company that's making all this
21 happen.
22   Q. Did he mention amounts?
23   A. I've heard all kind of amounts.
24   Q. Did he mention that Richard Arnold was his
25 lawyer?

Page 36

1    A. At some point along the way, yes.
2    Q. And did he identify Arnold or introduce him to
3  you?
4    A. No. I don't know him, never spoken to him.
5    Q. Did he tell you where he was from?
6    A. Carolinas. Either one, north or south.
7    Q. Did he specifically say he represented him or his
8  sources?
9    A. Richard Arnold represents Barker.
10   Q. Right.
11   A. Yes. He constantly in conversation talks about
12 my attorney in North Carolina, Richard Arnold, da, da, da,
13 da, da.
14   Q. And what did he say Arnold was supposed to do?
15   A. I don't know. It's his attorney, so whatever --
16   Q. He just identified him and nothing else?
17   A. Whatever is legal, that's what he does. I don't
18 know what his job function or his function is as his
19 attorney.
20   Q. How about Wilson, Steve Wilson?
21   A. I never -- I never met Steve Wilson.
22   Q. Did you ever become aware that he and Settles
23 were partners?
24   A. Only from conversation that Tom says my partner,
25 Steve.

Page 37

1    Q. I see.
2    A. That's my only --
3    Q. How many conversations did you have with Barker?
4    A. I have many conversations. I don't know how
5  many. I mean, I've talked to him.
6    Q. Did you get a feeling that this transaction was
7  actually going to happen?
8    A. I don't talk to Barker about the transaction. He
9  and I -- I started conversing. He started telling me about
10 Salvation Army. We start talking ministerially.
11 Illogically, scripturally, and then physically he's been
12 fighting diabetes. He's very fragile. So every once in a
13 while I'll pick up the phone just to say how are you. Now,
14 he may in the course of the conversation say everything is
15 moving smoothly, et cetera. Well, I've been -- that I kind
16 of tune out, because we've been here this for two years.
17   Q. That's --
18   A. So I just go deaf when that conversation -- and
19 then he doesn't -- he's not able to share anything, because
20 he's always sworn to secrecy or privacy or -- so I just
21 call because we've had the kind of rapport to speak
22 scripturally. And that's it.
23   Q. Is he knowledgeable? Is he --
24   A. He is extremely knowledgeable.
25   Q. Is he also a Doctor of Divinity or --

10 (Pages 34 to 37)

Page 38

1    A.  I don't know -- I don't know that he is.  I heard
2  from another source, Pastor Feaster, to be specific, that
3  he was a bishop at one time.  But he has never mentioned
4  that to me.  His wife is a pastor in the Salvation Army
5  and -- but he's never labeled himself as in the ministry.
6    Q.  Do you remember where you call him?
7    A.  I call him at the only number that everybody has.
8  I mean, it's a pretty generic number.  Everybody uses it.
9    Q.  And he always answers?
10    A.  Always.  90 percent of the time.
11    Q.  Do you have a feeling he is housebound?
12    A.  Yes.
13    Q.  And very ill?
14    A.  Uh-huh.
15    Q.  Has he had any amputations as to diabetes or has
16  severe diabetes?
17    A.  Has he had what?
18    Q.  Amputations, feet, legs, arms?
19    A.  I don't know.
20    Q.  Okay.
21    A.  I've never seen the man.
22    Q.  Never really talks more personally about himself?
23    A.  Not to that extent.
24    Q.  Yeah?
25    A.  I never had a feeling that he was a amputee.  I

Page 39

1  had the impression that he's housebound because of his job,
2  the nature of his job.
3    Q.  And what job is that?  Raising and distributing
4  funds?
5    A.  Something like that.
6    Q.  Does he talk --
7        MR. McMAHAN:  No.  No.  Raising, not
8  distributing.
9        MR. RAKESTRAW:  Too late to strike it.
10    Q.  (BY MR. RAKESTRAW)  So does he talk about
11  Settles?
12    A.  He doesn't have very much that's in the way of
13  good to say about Settles.
14    Q.  How about bad, does he say anything bad about
15  him?
16    A.  He's not the type of person to derail or deride
17  anyone.
18    Q.  Right.
19    A.  He just says I'd rather not talk about that.
20  He's something else, or he'll give it a name.  But you know
21  that it's not a good feeling that he has.
22    Q.  In the course of your travels around the country
23  or internationally, do you run across Settles in any other
24  context?
25    A.  No.

Page 40

1    Q.  How about Barker?
2    A.  No.
3    Q.  Anybody else talking about Barker?
4    A.  No.
5    Q.  And I guess that only leaves Arnold.
6    A.  No.
7    Q.  So it's -- it's that triangle that seems to be
8  the nub of this deal.  I mean, Settles, through Feaster, to
9  you with Barker being the procurer of funds.
10    A.  I think that's accurate.
11    Q.  Yeah.  Has he ever mentioned the 550,000?
12    A.  He mentions that he owes Settles, Omega Paving,
13  not 550, but 480.
14    Q.  480.  So he's not talking anymore about 6 million
15  or 10 million.  He's talking about --
16    A.  Never has talked about 6 or 10 million to me.
17  Never has.
18    Q.  Even though that -- I take it that's what Settles
19  was referring to when he said, "I'm going to get you
20  2 million?"
21    A.  Well, he would have to get it from somewhere.
22  And I don't know where he's referencing -- I have the
23  feeling that it's connected to the download of that -- that
24  Barker's working on, yes.
25    Q.  Did he describe the two corporations, Pacific Rim

Page 41

1  and Merchants?  Have you ever talked to him about that?
2    A.  Pacific Rim, I know nothing about.  J.J. Jones,
3  I've talked to him a couple times.  Totally unimpressed.
4  He doesn't talk on point.  So I just don't have time
5  that -- when you ask where Miami is, he starts on Alaska
6  and works his way around the world.  I don't have time for
7  that.
8    Q.  I understand.
9    A.  So I stay away from J.J. Jones.  And I know
10  nothing about Pacific Rim or what they do, what they're
11  trying to do.  I don't know Merchants, what he does, what
12  he's trying to do.  I don't know Tom, what he's paving.  I
13  don't know any of these guys.  All I know is we had a
14  contract, no money.  That's all I was interested in.  I
15  know no one else in this deal.
16        MR. RAKESTRAW:  Let me talk to Dick for a minute
17    and see if we have any other questions.  But we're
18    about to wrap up.
19        (Recess taken at this time.)
20        MR. DOWNING:  We'll read and sign.
21        (Witness excused.)
22        (Thereupon, the deposition was concluded at 5:31
23    p.m.)
24            - - -
25

11 (Pages 38 to 41)

Page 42

I have read the foregoing and find the same to be true and correct to the best of my knowledge and belief with any corrections noted on the Errata sheet appended hereto.

_____

LUTHER JAMES BLACKWELL, JR.

The foregoing was acknowledged before me by LUTHER JAMES BLACKWELL, JR. who is personally known to me or has produced _____ as identification and who did/did not take an oath, this _____ day of _____, 2005.

_____

NOTARY PUBLIC

---

Page 44

through 42, is a true and complete record of my stenographic notes.

I certify further I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which the deposition is taken and, further, that I am not a relative or an employee or counsel employed in this case, nor am I financially interested in the outcome of this action.

_____

MARGARET F. RIDDLE, RDR, CRR

NOT CERTIFIED UNLESS SIGNED IN BLUE INK

---

Page 43

STATE OF FLORIDA )
: SS
COUNTY OF MARTIN )
                CERTIFICATE
        I, MARGARET F. RIDDLE, RDR, CRR, a Notary Public of the State of Florida at Large, authorized to administer oaths, certify that LUTHER JAMES BLACKWELL, JR. personally appeared before me and was by me first duly sworn to tell the truth.
        WITNESS my official seal this 28th day of March, 2005.

_____

MARGARET F. RIDDLE, RDR, CRR

STATE OF FLORIDA )
: SS
COUNTY OF MARTIN )

            CERTIFICATE

    I, MARGARET F. RIDDLE, RDR, CRR, a Shorthand Reporter and Notary Public of the State of Florida at Large, certify that I was authorized to and did stenographically report the deposition of LUTHER JAMES BLACKWELL, JR.; that a review of the transcript was not requested; and that the foregoing transcript, pages 1

---

Page 45

NAME OF CASE:  RAM GROUP V. GEORGIA REAL
NAME OF WITNESS: LUTHER JAMES BLACKWELL, JR.
            ERRATA SHEET
PAGE LINE   CHANGE        REASON

____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____
____ ____ _____ _____

12 (Pages 42 to 45)

Page 46

Under penalty of perjury, I declare that I have read the foregoing document and that the facts stated therein are true. I hereby certify by the above corrections, if any, that the foregoing transcript is a true and correct transcription of my deposition taken in the above-entitled case at the date and time indicated.

_____
LUTHER JAMES BLACKWELL, JR.

Page 2

If you have any questions, please do not hesitate to call our office.

Sincerely yours,


Margaret F. Riddle, RDR, CRR

CC:  Vincent Rakestraw, Esquire

Page 47

ATLANTIC REPORTING
55 E. Osceola Street
Suite 201
Stuart, Florida  33494

March 28, 2005
Timothy J. Downing, Esquire
ULMER & BERNE, LLP
Suite 900
1300 E. Ninth Street
Cleveland, Ohio  44114-1583
RE:  RAM GROUP v. GEORGIA REAL
    Deposition of LUTHER JAMES BLACKWELL, JR., taken
3-23-05
Dear Mr. Downing:
Enclosed please find the original signature page for the
above-described deposition along with an errata sheet for
any corrections.
As per our conversation you will take care of all aspects
regarding reading and signing of LUTHER JAMES BLACKWELL,
JR.'s deposition, it is my understanding that you will
furnish the deponent with a copy to read.  Enclosed is an
errata sheet for any changes or corrections.  Please have
LUTHER JAMES BLACKWELL, JR. execute the original signature
page and errata sheet after completion of the reading.
Please be sure both the signature page and errata sheet are
duly notarized.
Please mail the original executed signature page and errata
sheet to Vincent Rakestraw, Esquire along with a copy for
the attorney's certified copy, and copies so that they may
be put in the respective copies of the deposition.

If the witness has not read and signed the deposition by
the close of business on April, 2005, the deposition may be
filed without the witness's signature.

13 (Pages 46 to 2)

**A**

able 8:20
37:19
about 4:23
5:16,18
6:11,16 8:1
10:12 11:10
11:24 12:17
12:24 14:16
14:24 15:1
16:1,23
17:21 18:6
19:7,10
20:23 21:11
22:9,11
24:10 28:3
31:12,19,24
32:13 35:5
35:14 36:11
36:20 37:8
37:9 38:22
39:10,13,14
39:14,19
40:1,3,14
40:15,16
41:1,2,10
41:18
above 46:5
above-desc...
47:11
above-enti...
46:8
accelerated
14:12
accepted 8:19
according
33:16
accuracy
29:19
accurate
40:10
acknowledged
42:8
acquisition
9:5 35:13
across 39:23
act 31:17
action 44:5,8
actions 28:13
actively 9:4
18:5
actual 15:18
actually 28:2
28:7 37:7
adding 8:4
address 3:25
4:4 33:18
33:19
administer
43:5
advertise
14:22
advertised
11:12
affirmed 3:4
after 3:4 6:4

6:14 17:20
24:23 28:6
31:12 32:18
47:16
afterwards
28:8
again 8:21
agent 35:16
ago 14:24
19:4
agreed 17:1,5
19:23,24
agreement 2:7
2:7 13:16
14:3,11
15:10,10,20
15:25 16:6
16:24 17:6
17:12,15
18:3 20:6
20:10 21:22
22:16,24
23:10,12
24:15,18
26:19,22
ahead 6:6
29:20
al 1:6 17:4
Alaska 41:5
Allen 34:24
35:5,11
allowed 9:1
almost 6:4
25:11 28:7
35:3
along 36:1
47:11,18
already 3:8
4:19 16:13
16:13 25:25
although
13:15
always 8:10
37:20 38:9
38:10
America 12:2
amounts 35:22
35:23
amputations
38:15,18
amputee 38:25
analysis
28:11
Anchored 8:16
14:5,17
15:15
anniversary
13:11
another 3:12
5:11 8:12
38:2
answers 38:9
anticipation
32:15
anybody 33:3
40:3

Anyhow 18:12
anymore 40:14
anyone 24:10
39:17
anything 3:10
11:10 19:6
21:11 22:9
24:8,24
28:3 32:13
32:16 37:19
39:14
anywhere
29:23
Apparently
30:14
APPEARANCES
1:15
appeared 43:7
appended 42:3
appraisal 2:6
7:14,23,23
appraisers
8:2
appreciation
27:10
approximate
34:13,14
Approximately
5:14 7:5
April 47:21
area 6:5
Arizona 3:22
4:2,3,7,10
4:12
arms 38:18
Army 37:10
38:4
Arnold 35:24
36:2,9,12
36:14 40:5
around 13:5
13:13 26:14
39:22 41:6
arrange 17:17
17:20
arrangement
16:22 19:12
25:8,20
asked 8:16
14:14 16:23
17:15 30:19
31:2,16
asking 10:2
23:7
aspects 47:15
assessment
8:5
assignment
33:21
assisted
24:20
assisting
24:21
Atlanta 21:8
ATLANTIC 47:1
attention

16:14 31:4
attorney
24:22 30:2
36:12,15,19
44:3
attorney's
47:19
August 21:10
author 11:23
authorized
43:5,22
available
11:7 17:3
AVIC 24:22
aware 22:18
22:20,20
23:15,19
36:22
away 10:20
41:9
AZ 4:5

**B**

Bachelor's
12:5
back 6:14
background
12:4
bad 39:14,14
ballpark 26:3
Barker 28:2,3
34:6,8,24
34:25 35:5
35:11,15,16
36:9 37:3,8
40:1,3,9
Barker's
40:24
based 20:20
basically
18:23 31:20
basis 10:22
Bauer 7:14
become 36:22
before 18:9
24:2 27:20
29:18,21
33:9 42:8
43:7
began 5:15
35:3
begin 6:13
beginning
28:16
behalf 3:3
being 6:1 8:3
21:21 24:11
24:20 28:17
28:20 40:9
belief 42:2
believe 13:18
27:23 28:18
29:4 31:19
Believer 11:5

beneficial
7:15
Berea 12:6
BERNE 1:18
47:5
best 33:2
42:2
better 3:23
11:15
between 9:6
Beyond 19:18
bigger 8:7
bishop 4:13
4:16 38:3
Black 11:4
Blackwell 1:8
2:3 3:2,20
3:21 7:20
7:21 16:1,3
16:4 23:22
23:24 25:3
25:4 27:14
27:15 30:8
32:21,25
43:24 45:2
46:10 47:8
47:13,15
BLACKWELL,JR
42:9
BLUE 44:13
book 11:2,2,3
11:4
books 10:25
11:6
both 12:17,21
47:16
bottom 18:20
19:25 22:15
brand 32:15
break 3:18
bringing 17:4
broadcasting
9:7,17
brought 6:13
34:22
business
47:21
buy 8:16
22:12,13,22
buyer 14:4
BW 13:3

**C**

C 33:20,22
California
12:7,20
call 17:12,13
17:15 18:15
31:10,11,13
34:17 37:21
38:6,7 2:2
called 3:3
5:3 11:2,3
11:4 17:14
18:9,11,11

31:19 34:17
came 8:15,19
14:5,19
15:9,9
20:10 24:13
cancel 26:11
cancelled
24:23 26:9
26:11 28:7
care 8:24
15:21 19:9
47:13
career 5:7
Carolina
36:12
Carolinas
36:6
case 1:2
17:25 44:7
45:1 46:8
CC 2:6
certainly
11:23 32:16
CERTIFICATE
43:3,18
certified
44:13 47:19
certify 43:6
43:22 44:3
46:5
cetera 8:5
35:12 37:15
CHANGE 45:4
changes 47:15
Chappell 29:3
29:3
charter 4:5
6:16
check 11:17
children 13:6
13:8
Chinaberry
3:25
choose 4:11
4:16 9:14
10:23
Christ 8:17
14:5,17
15:16
Christian
9:20 11:23
5:18,21,22
6:12,14,22
6:24 7:2,3
7:4,6,8,12
7:25 8:1,7
8:12,13,14
8:15,21,23
9:2,6,8,14
10:8,18
11:12 14:2
15:20 16:16
17:9 18:21
19:2,9 20:4
20:25 22:12

Page 4

22:23 23:8
23:16 24:11
24:25 25:21
25:22 27:24
28:9,12,19
29:12 33:18
33:19
churches 4:24
5:1,8,9,12
10:18
Circle 3:25
circles 10:8
11:23
circumstance
34:16
clause 30:17
Cleveland
1:20 5:6,25
6:3,4,7,13
33:15 47:7
close 47:21
closed 6:12
Co 5:10
collateral
22:19 23:21
24:14 25:23
26:16 28:22
31:17
collateral...
19:15
collateralize
19:2 26:7
college 12:6
12:7,10,20
Columbus 1:17
3:8
come 17:21
29:1
coming 5:24
13:12 21:9
22:21 23:7
24:24 28:1
28:2 35:11
commitment
24:14 25:12
25:24 26:5
26:16 27:11
28:21,22
committed
35:9
COMMON 1:1
communicate
25:14,16,19
communicated
33:2
communication
18:14
company 31:24
35:20
complete 44:1
completion
47:16
concern 27:2
concluded
41:22
conference

21:9
conferenced
32:6,7
34:25
congregati...
12:13
connected
40:23
connection
18:16
consideration
23:21
consistent
4:20 7:20
consists 12:7
constantly
8:4 36:11
construed
33:15
consummate
17:23
contact 18:13
18:15
contacted
16:23 31:24
34:25
contempora...
18:5
contempora...
25:11
contents 8:24
context 7:19
39:24
CONTINUED
30:12
contract 9:1
17:1 19:23
19:24 41:14
contribute
25:21
conversation
18:19 19:4
20:20 21:13
26:21 31:20
32:4,5,23
35:4 36:11
36:24 37:14
37:18 47:13
conversations
37:3,4
conversing
37:9
copies 47:19
47:19
copy 7:17
15:24 25:2
29:17 47:14
47:18,19
corporation
6:23,25
corporations
40:25
correct 4:15
6:22 7:1
9:20 23:3
42:2 46:7

corrections
42:3 46:6
47:12,15
Cortland 5:5
6:12,15
counsel 15:24
29:7,8 44:4
44:6
country 39:22
COUNTY 1:1
43:2,17
couple 6:7
9:25 33:5
41:3
course 10:3
37:14 39:22
court 1:1
4:19
co-situation
5:9
CRR 1:14 43:4
43:12,20
44:11 2:5
crusades 6:7
6:8
CUYAHOGA 1:1
CV05555218
1:2

**D**

D 2:1 15:14
da 36:12,12
36:12,13,13
date 1:9 18:3
20:18 25:9
34:12 46:8
dated 7:24
24:1 27:17
Davis 29:3
day 8:24
11:18 15:1
15:21 42:12
43:9
days 18:9
deaf 37:18
deal 14:8
15:12 20:23
22:10,11
24:23 40:8
41:15
Dear 47:10
debtor 22:25
debt-free 9:2
decided 6:3,6
11:19
declare 46:3
Deed 2:11
defaulted
23:15
DEFENDANT
1:18
Defendant(s)
1:7
degrees 12:18
DeLargy 33:8
33:8,20

deliver 8:20
Deliverance
5:10,16
deponent
47:14
deposition
1:8 41:21
43:23 44:5
46:7 47:8
47:11,14,19
47:20,21
derail 39:16
deride 39:16
describe
40:25
diabetes
37:12 38:15
38:16
Dick 41:16
did/did 42:11
DIRECT 2:3
3:6 30:12
disappeared
24:21
disbursed
24:11
disbursement
30:23
discuss 24:14
discussed
32:1
discussion
29:16 34:4
disprove
34:23
distributing
39:3,8
distribution
35:14
Divinity
37:25
doctor 4:16
4:17,19
7:22 16:5
25:5 37:25
Doctor's
12:19
document
14:13 19:17
20:15 23:25
25:15 31:23
32:19 33:24
46:4
documentation
19:19
documents
21:14,19,21
21:25
doing 11:10
35:7
done 9:25
27:3 32:15
down 6:12
35:2
Downing 1:20
7:17 13:18

13:20 15:23
30:4 33:22
41:20 47:5
47:10
download
40:23
Dr 16:1
draft 20:8
31:5
Drive 4:5
duly 3:4 43:7
47:17

**E**

E 1:19 2:1
34:24 47:1
47:6
early 6:21
East 4:5 6:11
education
12:5
educational
12:4
Either 36:6
employed 44:4
44:7
employee 44:6
Enclosed
47:11,14
end 19:22
ended 32:22
endorse 29:24
enforced
33:16
engaged 16:20
enjoyed 13:15
entered 19:25
entering
16:23
ENTERPRISES
1:6
entertained
8:6,8,21
entertaining
8:10
entire 33:4
errata 42:3
45:3 47:11
47:15,16,16
Esquire 1:13
1:16,20
47:5,18 2:6
estate 15:19
et 1:6 8:4
17:4 35:12
37:15
Europe 12:2
evaluation
10:2
even 34:14
40:18
ever 8:6 21:1
24:2,10
25:13 31:24
32:25 35:13

36:22 40:11
41:1
every 26:23
26:25 37:12
everybody
38:7,8
everyone 3:15
everything
16:17 37:14
exactly 5:13
10:13 19:5
EXAMINATION
2:2,3 3:6
30:12
examined 3:4
Excellent
16:12
except 11:8
excuse 12:18
excused 41:21
execute 47:15
executed
47:18
Exhibit 2:6,6
2:7,8,9,10
2:11 7:21
13:18,19
16:4 23:24
25:4 27:15
30:8 32:21
33:22
exhibits 2:5
33:5
expansion
8:10,11
expected
31:23 32:3
explore 3:23
exposed 6:1
extent 38:23
extremely
37:24

**F**

F 1:14 43:4
43:12,20
44:11 2:5
facilitate
14:11
facility 6:18
8:24 9:6
fact 13:24
14:9 32:19
facts 46:4
failed 22:10
fair 8:5
11:22 17:22
false 33:17
familiar
13:22
families 7:5
family 13:5,6
far 5:7
fashion 14:13
favor 33:14
fax 20:10

ATLANTIC REPORTING
(800) 336-0050

```
22:3                5:22                29:22 32:16        32:12 34:8        interested          keep 30:4
faxed 20:7,14       four 6:11           32:24 33:5         34:11 35:1          19:8,9            keeping 24:25
Feaster 2:8         fragile 37:12       37:7 40:19         36:2,4,4,7          20:24 41:14       keeps 4:19
  15:15 18:14       Friday 6:10         gone 33:6          36:16 37:5          44:7              kept 26:23
  18:20 25:8        from 2:9 3:13       good 39:13,21      38:6,7            Interesting         kind 6:8 19:3
  34:20 35:8          4:25 5:17         graciously         39:15 41:1          11:6 12:4           32:22 35:10
  38:2 40:8           5:25 6:3,17         25:21            41:3                12:15 18:1          35:23 37:15
Feaster's            7:13 8:16         graduated        himself 35:8        interests             37:21
  35:6               10:16,20            13:1,3           35:9 38:5           17:5              knew 21:9
feel 3:11           12:5,7,21         grant 25:21        38:22             international         23:6 31:22
  14:1              13:1,3,3           27:25            hits 11:15,19         10:10               31:23
feeling 13:25       21:16,19          grew 12:25        Holy 5:4           internatio...       know 3:8 7:12
  17:7,10           27:2,24           GROUP 1:3         home 10:20           11:24 12:1          8:9 10:13
  37:6 38:11        28:2,13,21          45:1 47:8         13:9                39:23               11:17,20
  38:25 39:21       28:23 29:18       grow 12:24        honor 16:25        Internet             13:17 15:3
  40:23             35:11 36:5        guarantee        host 9:17            11:10,12            16:22,23
feet 38:18          36:24 38:2          27:23           hours 26:19        interview            17:14 19:3
Fellowship          40:21 41:9        guess 40:5       House 5:3,15         9:19                19:4,21
  5:5,17,24         front 26:17       gun 31:14        housebound         introduce            20:8 22:1
few 18:9            fulfilled         guys 41:13         38:11 39:1          7:10 17:11          22:11,11
fighting            19:24                                                    18:24 36:2          25:13 26:25
  37:12             full 3:19         ─────────────    ─────────────      invited 21:9         28:3 29:25
file 31:16,17       function              H                 I             involved 9:4         30:21,22,25
  31:18             36:18,18        hand 7:22         idea 8:6,21        Iyesha 15:14         31:6,7,15
filed 47:21         funds 17:5        13:14 32:24      18:24 19:1          19:25               31:22 32:13
Filled 11:3,8       35:17 39:4        33:5,23          identifica...      I-Y-E-S-H-A          32:17 34:6
finalize 14:8       40:9            handing 16:5        7:21 16:4          15:14               34:9 36:4
  17:12,16          furnish 15:22      23:25 27:16      23:24 25:4       ─────────────         36:15,18
finalized           25:2 47:14        33:8             27:15 30:8            J                37:4 38:1,1
  17:17             further 27:24   handle 15:5        32:21 42:11      J 1:20 47:5          38:19 39:20
finalizing          44:3,6          happen 15:5      identified        Jack 10:15           40:22 41:2
  15:12             F-E-A-S-T-E-R      19:3 35:20        36:16            Jakes 10:15         41:9,11,12
financially         15:15             35:21 37:7      identify 16:7        21:8                41:13,13,15
  44:7                              happened 5:23      16:10 24:1       James 1:8 2:3        knowing 8:2
financing         ─────────────       19:13 31:13      25:6 27:18         3:2,20 42:6        knowledge
  17:18,20              G           happy 27:2         30:13 35:13        42:9 43:6            24:5 33:3
find 42:1         gap 29:10         having 3:4         36:2               43:23 45:2          42:2
  47:11           gave 4:10         Hayford 10:15    ill 38:13           46:10 47:8         knowledgeable
fine 27:6,6         18:15           heard 32:2       Illogically         47:13,15            37:23,24
finished 30:6     generic 38:8      35:23 38:1         37:11            job 36:18           known 10:8
first 3:4         Georgia 1:6      hearing 6:2      implication         39:1,2,3            11:22 12:1
  11:2 31:22        18:7 21:12     help 14:11         6:5              Jones 41:2,9          42:9
  32:2 43:7         21:16 30:24      16:25 17:2      implied 34:21      journey 6:3       ─────────────
five 6:12,14        45:1 47:8        18:20 20:3      impression        Jr 1:8 2:3               L
  29:10           gets 16:14        22:13,23,22       18:2 39:1          3:2,20 42:6      L 15:15
Florida 1:12      getting 23:20      31:20           Inajo 29:2          43:6,24            labeled 38:5
  1:14 33:16      gifting 26:2     helped 20:24      inappropriate       45:2 46:10         lack 11:15
  43:1,5,16       girl 13:10,11    her 14:8           3:11               47:8,14,15        lady 29:14
  43:21 47:2      give 16:24        15:11,14        INC 1:3,6          July 2:10          lady's 22:12
flow 26:4           17:15 27:5      16:25 17:2      Incorporated        7:24 18:4          land 9:1
flying 20:10        27:6,8 28:9     17:4,8 20:3       6:23,24 7:8        30:16             large 1:14
followed            34:12,14        22:13 23:12       15:16            just 3:16            7:4 43:5,22
  11:20             35:8,9          29:9,11        incorrect            4:10 7:11          last 21:6,10
follows 3:5         39:20           34:21,22,23      33:17               7:15,17            29:10
foregoing         giving 14:12    hereto 42:4      Independence         9:18,18           late 39:9
  42:1,8            27:1          Heritage 11:4      32:1               15:23 19:21        later 24:12
  43:25 46:4      go 4:24 6:6     hesitate 2:2     indicated            20:18 26:23        31:12 32:16
  46:6              29:15,20      he'll 39:20        46:8               27:2,8             32:19 35:3
form 22:21          30:9 37:18    High 13:1        individuals          29:25 33:23       launch 6:13
  25:17 28:20     God 11:18       him 7:11,11       5:24               36:16 37:13        laws 33:16
  28:24 29:1      going 3:10       10:17 11:3      initial 15:14        37:18,20          lawyer 29:2
formally 4:11       7:10,11,22     11:8 15:11       15:15               39:19 41:4         32:1 35:25
found 5:20          10:5 15:5      17:14,14,15    INK 44:13           J.J 41:2,9          lawyers 31:25
founded 5:18        17:2 19:22     18:11,15,17    instrument          ─────────────       lawyer's
  5:20              19:23,24       21:1,2,4,5       12:9                     K               10:19
founder 5:21        22:12,13       21:7,10,19    interest 27:9       keen 31:2           leaves 40:5
                    28:9,12        22:7 26:20       33:13
```

ATLANTIC REPORTING
(800) 336-0050

Page 6

```
legal 36:17          magnitude             22:19                move 19:16           nothing 19:14         once 9:24
legs 38:18            12:3                  meetings             moved 6:11            19:18 20:22           15:10 37:12
lent 18:6             mail 47:11            10:16                moving 8:7           20:23 22:11          one 4:11,19
let 7:18              major 12:10           Mega 5:5,18           37:15               31:22,25              8:12 11:18
 15:23 17:14         make 6:3 9:5           6:13,22,24          much 39:12           32:14,18             32:2,3,6
 33:23 34:23          10:2 16:25            7:3,8 27:23         music 12:5           36:16 41:2            35:19 36:6
 35:5 41:16           19:3,11              member 10:18         myself 10:2          41:10                 38:3 41:15
letter 2:8,9         Makes 9:7              29:12                mystery 34:18       not-for-pr...        ones 21:21
 2:10 7:24           making 26:15          members 6:16                               6:23,24             only 5:7
 24:15,22             26:17 35:19          mention 35:22       _____         November 2:9          11:18 14:20
 25:6,7               35:20                 35:24                     N                27:17 29:6          14:21 20:4
 27:16,20            man 38:21             mentioned          N 2:1                  nub 40:8              23:11 28:18
 28:11 30:13         manner 19:2            14:4 24:12        name 3:19              nucleus 6:15          31:5 32:4
 30:14,18             27:13                 24:17 38:3         6:22 7:1              number 17:12          36:24 37:2
 31:4                many 10:18             40:11              15:14 31:9             18:15 20:12          38:7 40:5
Let's 4:17            37:3,4,5             mentions            39:20 45:1            38:7,8               opinion 7:13
level 10:18          March 1:9              40:12              45:2                                       Oral 10:15
lie 33:17             43:9 47:4            Merchants          names 34:1           _____         ordained 4:22
life 5:5,17          Margaret 1:14          41:1,11           name's 3:7                  O                4:23
 5:24 33:1,4          43:4,12,20          met 21:2,4,10       narrative                                  order 22:20
 33:4,10,25           44:11 2:5             22:7 34:6,7        3:16                 Oak 4:5                22:22 34:23
like 7:17            mark 7:16,18           35:10 36:21       national              oath 42:11           organization
 13:14 22:5           7:19 16:2           Miami 41:5           10:10                oaths 43:6            5:3 15:17
 29:17,19             23:22 25:3          miles 10:20         nationally            objects 3:13         original
 39:5                 27:14 32:20          13:13               10:1,8               obligate              47:11,15,18
likely 30:19          33:7                million 7:25         11:22                23:16                originally
line 18:20           marked 7:21            8:23 14:6         nature 39:2           obligated             18:18
 20:1 22:15           13:16,17             16:14 19:23        need 31:4              35:7                 originals
 32:7,8 45:4          16:4 23:24           24:11 25:12        negating 25:8         obligation            30:5
litigation            25:4 27:15           25:16,22          negotiate             14:2 22:19            Osceola 1:11
 28:13,17,17          30:8 32:21           26:2,16            16:21                  27:24                47:1
 28:23                33:6,20              27:5,5,6,13        neither 44:3          obviously            other 11:8
little 24:23         market 6:9             28:9 40:14        net 11:11             19:17 32:14           18:19 19:10
live 3:21,22          8:12,13              40:15,16,20        Network 9:17          occasionally          20:24 21:19
 3:24 4:2,3          married 13:11        mind 29:17          never 11:20           9:14                  27:25 30:21
 13:5                marry 13:10          mine 16:11          15:4 21:4            October 2:8           30:23 39:23
LLP 1:18 47:5        MARTIN 43:2          ministered          21:14 24:8           25:10                 41:17
loan 28:1             43:17                 4:25              25:15 29:21          off 29:15             otherwise
local 6:5            Master's 12:8        ministerially      31:9,24              30:9 34:3             31:6
located 33:14        may 14:14             37:10              33:1,4,10            offer 8:19,22         out 3:13
long 29:7,9,9         17:7 22:5           ministry 5:25      33:25 34:6            8:23 14:15            19:10 20:6
look 8:12             23:16 37:14          6:1,6 38:5        34:7,7,7              14:16 15:19           24:25 37:16
 13:21 16:7           47:19,21            minor 12:10        36:4,21,21           office 2:2            outcome 44:8
 25:5 27:17          maybe 19:2           minute 41:16       38:3,5,21            official 43:9         over 8:25
 33:9                McMahan 1:21         minutes 13:8       38:22,25             Officially             14:6 15:11
looking 9:3           2:10 13:18          Mission 12:7       40:16,17             4:12                   16:7 24:23
 17:20                13:19 18:6          money 14:12        new 5:4,17,24        Off-the-re...         25:6 27:17
lot 9:7 15:18         30:16 31:4           17:21 19:20        9:6 32:15            29:16 34:4            31:25 33:6
Louis 13:11           31:6,16,20          23:7 27:2,8        nice 29:14           often 9:22            33:9
lunch 21:10           32:4,10             32:18 34:18        night 6:10           oh 4:23 10:1          overrode 6:5
Luther 1:8            33:22 39:7          34:21,22           Ninth 1:19            22:8                  owes 40:12
 2:3 3:2,20          McMahan's           35:6,11,14         47:6                 Ohio 1:1,17            owned 7:6
 42:6,9 43:6          30:21 31:9          35:14 41:14        non-profit            1:20 3:22
 43:23 45:2           32:12               monies 17:3        15:16               3:25 4:1,7           _____
 46:10 47:8          mean 8:9             28:1               north 36:6,12        4:8,9,23                   P
 47:13,15             10:14 14:1          month 9:24        northeastern         5:4,5,6,10
Lutheran 6:11         17:17 18:25         months 6:11        6:2                 5:25 6:2,7            Pacific 40:25
                      20:14,23             6:17 35:2        notarized            12:6,25               41:2,10
_____         21:2 26:25         more 8:3           47:17               33:15 47:7            page 2:2 16:9
      M               37:5 38:8           10:19 13:13       Notary 1:14          Okay 4:18,21          45:4 47:11
Macedonia 4:1        40:8                  19:6 38:22        42:14 43:4          13:2 18:22            47:16,16,18
made 7:14            meaning 5:10         mortgage 2:11      43:21               23:19 27:19           pages 43:25
 8:19 15:9            8:25 13:6            31:25 33:14       note 21:22          28:5 29:5             paid 6:18,18
 17:8,14             meant 17:19          Most 30:19         29:23 33:7          33:5 38:20            16:20
 18:13,16             28:11               motivation        33:13               Omega 20:14           paragraph
 26:3,19,21          meet 21:1,5,7         20:2,3,4         noted 42:3           21:16 23:3            33:11,12
 32:17 34:20                                                notes 44:2          27:12 30:24           part 3:23
                                                                                40:12                 8:11
```

ATLANTIC REPORTING
(800) 336-0050

parties 44:5
partner 36:24
partners 2:7
  36:23
party 23:3,10
  23:11
part-time
  3:22,22
pastor 2:8
  9:16 15:15
  18:14,20
  19:25 25:7
  34:20 35:6
  35:8 38:2,4
pastored 5:1
  5:3,16
pastoring
  5:15
paving 20:14
  21:16 27:12
  30:24 40:12
  41:12
payee 33:14
penalty 46:3
people 6:2,8
  6:15 9:19
  30:25
per 47:13
perceive
  32:11
percent 38:10
percussion
  12:10
perfect 31:23
perfecting
  25:20
period 14:14
  14:25 23:2
perjury 46:3
person 39:16
personality
  9:19
personally
  38:22 42:9
  43:6
phone 26:20
  32:5 37:13
physically
  37:11
Ph.D 12:8
piano 12:11
pick 37:13
piece 23:21
PLACE 1:11
places 12:3
Plaintiff
  1:16 2:5
  3:3
Plaintiff's
  13:16
Plaintiff(s)
  1:4
planned 9:5
platforms
  10:10,11
play 12:12

pleading 7:1
PLEAS 1:1
please 16:2,9
  23:23 25:5
  47:11,15,16
  47:18 2:2
point 13:15
  19:16 24:19
  26:8 28:8
  29:2 36:1
  41:4
population
  6:4
portion 7:23
  19:1 35:8,9
possible 26:3
possibly
  30:21
post-grad
  12:6
Power 11:3
Praise 11:3,8
Prayer 5:4,15
present 1:21
  5:19 6:18
  8:12 14:10
presentation
  17:8
presently
  10:15
presupposed
  20:21
pretty 38:8
Primary 14:4
print 11:6,7
prior 15:3
privacy 37:20
probably 3:12
  8:3 14:24
  30:4 35:2
process 19:22
  26:7
procurer 40:9
produce 31:15
produced
  42:10
producing
  31:15
program 9:20
project 35:7
property 14:6
  27:3 33:14
prove 35:11
provide 26:15
providing
  15:24
provisionary
  30:17
Public 1:14
  42:14 43:4
  43:21
published
  11:23
pulpit 10:14
purchase 2:6
  9:4 14:5

15:19,20,25
  16:6,25
  17:9 18:21
  19:11 20:3
  20:25 22:22
  23:12 25:25
purchased
  6:17
purchaser
  14:6,11
  15:7,8
  16:20 19:20
  22:22
purpose 14:13
put 7:14
  11:18 21:21
  29:18 31:19
  47:19
p.m 1:10
  41:23

_____
     Q
_____
quarters 8:7
question 3:11
  3:17 7:25
  24:7 33:24
questions
  41:17 2:2
quick 33:24
quote 6:9

_____
     R
_____
R 24:9
radio 6:1,2
  9:9
Raising 39:3
  39:7
Rakestraw
  1:13,16 2:3
  3:7,7 7:10
  7:18,22
  13:19,21
  16:2,5
  23:22,25
  25:2,5
  27:14,16
  29:15,20
  30:6,9,13
  32:20,24
  33:23 34:3
  34:5 39:9
  39:10 41:16
  47:18 2:6
RAM 1:3 45:1
  47:8
rapport 37:21
rather 39:19
RDR 1:14 43:4
  43:12,20
  44:11 2:5
RE 47:8
reaction
  32:12
read 22:16
  24:6 29:19
  41:20 42:1

46:4 47:14
  47:20
reading 47:13
  47:16
real 1:6
  15:18 18:7
  21:12,16
  30:24 45:1
  47:8
really 8:2
  18:5 19:3
  21:14 38:22
reason 14:4
  28:18 31:5
  45:4
received
  32:17
Recess 30:10
  41:19
recognize
  33:24 34:1
recognized
  31:9
record 3:19
  15:24 21:22
  29:15,22
  30:9 34:3
  44:1
Reed 1:17
refer 4:13
referencing
  40:22
referring
  33:11 40:19
reflect 15:24
regarding
  34:17 47:13
regular 10:22
  11:15
regularly
  10:23
reiterate
  28:6,8
related 44:4
relative 7:12
  44:6
release 23:20
  28:19,21,23
  28:25
released
  27:24 28:12
remember
  18:19 26:24
  30:25 38:6
remodeling
  8:4
renovating
  8:4
report 43:23
reporter 1:14
  4:20 43:21
REPORTING
  47:1
represent
  15:11
representa...

17:23
represented
  33:3 36:7
representing
  14:7 23:12
represents
  36:9
requested
  43:25
resident 4:7
  4:9
respective
  5:12 47:19
responsibi...
  5:11 10:17
result 19:22
  26:16
return 25:23
  26:16
review 43:24
Richard 1:21
  35:24 36:9
  36:12
Riddle 1:14
  43:4,12,20
  44:11 2:5
right 2:6
  15:23,25
  16:6,16
  20:11 21:23
  26:5,13,17
  27:4,7
  34:19 35:18
  36:10 39:18
Rim 40:25
  41:2,10
road 1:17
  33:15 35:2
Roberts 10:15
role 35:13
rolling 26:23
room 34:9
roughly 7:25
run 39:23
rush 24:7

_____
     S
_____
s 12:8 47:14
sale 14:12,15
  14:16,21
  15:6 16:13
  17:23 24:21
  26:9 27:2
  28:7
Salvation
  37:10 38:4
same 14:16
  24:17 42:1
satellite-...
  6:6
satisfaction
  30:22
saw 30:1
saying 21:17
  25:12
says 23:17
  30:24 36:24

39:19
school 12:25
  13:1
Scottsdale
  4:3,5
Scranton
  33:15
scripturally
  37:11,22
SE 1:11
seal 43:9
Second 11:3
secondary
  14:3
secrecy 37:20
secured 23:3
  23:4,6
  33:13
security
  13:16 14:10
  16:24 20:6
  20:10 21:22
  22:16 24:18
see 4:13 5:23
  8:18 10:1
  16:20 23:13
  24:19 29:17
  31:11 37:1
  41:17
seeking 28:22
seems 40:7
seen 21:14,19
  21:24 24:2
  24:8 25:15
  27:20 29:21
  30:2 32:25
  33:9,25
  34:7 38:21
sell 8:14
selling 8:6
  8:21 19:9
  22:12
send 20:6
  30:18
sense 9:7
  31:14 32:17
sent 6:14
  19:17 22:3
  24:22 25:7
  27:23 30:14
September
  24:1 26:14
services 6:10
  7:23 9:8
set 20:21
settled 15:10
Settles 2:9
  14:7,9 15:3
  16:21 17:4
  17:7,11,13
  18:10 19:11
  19:16 24:11
  24:12 25:11
  25:16 29:18
  30:19 31:3
  31:8,14,18

32:5 34:17
34:21,23
35:9,10
36:22 39:11
39:13,23
40:8,12,18
severe 38:16
share 10:16
37:19
shared 5:10
10:14
sheet 42:3
45:3 47:11
47:15,16,16
47:18
Shorthand
43:20
show 7:11
sign 13:23
14:10 20:18
29:23 32:16
32:19 41:20
signature
13:23,24
16:9,10
30:15,16
47:11,15,16
47:18,21
signatures
16:11
signed 13:25
14:2,3
19:18 23:25
44:13 47:20
signing 19:19
22:21 31:25
47:13
since 7:6
8:20 17:24
21:2 34:8
Sincerely 2:3
sing 12:12,13
sink 22:6
sir 3:9,14
4:18 13:22
16:8,11
20:7 24:3
site 11:13,14
six 6:17
29:10
slightly 8:3
smooth 9:6
smoothly
37:15
sold 8:15
sole 17:22
solo 12:14
some 17:3
19:2 22:21
27:13,13
28:19,20
36:1
Somehow 18:15
something
14:10 15:22
22:3,5,6

39:5,20
somewhere
40:21
Soon 26:11
source 34:24
38:2
sources 36:8
south 3:25
12:2 36:6
speak 10:17
10:19 34:11
37:21
specific 38:2
specifically
36:7
spoke 17:3
spoken 10:14
12:2 34:8
36:4
SS 43:1,16
St 13:11
stadiums
10:16
start 8:25
37:10
started 5:24
6:10,15
24:8 37:9,9
starts 41:5
state 1:14
3:19 33:16
43:1,5,16
43:21
stated 46:4
statement
26:17 34:20
statements
26:15
Statewide
7:23
stay 9:1 41:9
stenographic
44:2
stenograph...
43:23
Stephen 24:9
Steve 36:20
36:21,25
still 9:7
11:6,7,7
12:12 13:5
24:20,21
25:12 32:7
32:8
stop 3:12,17
Street 1:11
1:19 47:1,6
strike 39:9
Stuart 1:12
47:2
stunned 32:14
Suite 1:11,19
47:2,6
summarizing
35:6
summary 35:4

summer 21:6
support 30:23
35:10
suppose 17:19
supposed
35:16,19
36:14
sure 18:11
27:25 28:15
28:18 31:5
47:16
surface 35:3
sworn 37:20
43:7

T

take 3:18
19:1 24:6
29:20 40:18
42:11 47:13
taken 1:13
30:10 41:19
44:5 46:7
47:8
talk 24:10
31:19 34:23
37:8 39:6
39:10,19
41:4,16
talked 18:17
26:23 32:3
35:1 37:5
40:16 41:1
41:3
talking 13:15
14:15,25
18:6 26:20
32:9,10
35:2,14
37:10 40:3
40:14,15
talks 36:11
38:22
teeth 22:6
telephone
31:13
television
5:25 6:3
9:12,13,13
tell 3:16
5:13,23
10:12,13
19:6 20:9
21:11 31:8
34:16 36:5
43:7
telling 37:9
Temple 5:10
5:16
terms 16:13
22:6,18
29:9
test 10:19
testified 3:5
testifying
16:1

testimony
21:24 31:3
34:5
thank 24:25
25:1
Thanks 15:18
their 8:22,23
16:22 17:22
thing 19:3
26:4
think 7:15,19
24:24 28:16
30:6 33:6
33:20 35:5
40:10
thinking 26:2
thinks 7:13
Third 11:4
Thomas 14:7,9
29:18
though 40:18
thought 14:7
15:12 26:8
threatened
28:17,20
three 5:7,9
6:11 29:11
through 4:24
11:20 12:2
17:6 40:8
44:1
Tim 3:13 7:10
time 1:10
4:25 8:20
9:3 14:7,14
17:24 18:2
20:19 21:12
23:2,15
24:6 25:13
26:8,23,25
28:8,15,16
29:7,9
30:10 31:7
31:23 32:2
32:4,11
34:8,13,15
34:24 38:3
38:10 41:4
41:6,19
46:8
times 41:3
Timothy 1:20
47:5
title 31:24
today 32:1
together 17:4
24:13 31:19
34:22
told 6:9
20:22,23
31:16 32:12
Tom 17:4
19:11 24:12
30:19 31:3
31:14,18
34:16,21,22

35:9,10
36:24 41:12
top 20:12
Total 28:25
Totally 41:3
transaction
18:6 19:7,7
19:8 21:11
22:9 30:24
31:12 37:6
37:8
transcript
43:24,25
46:6
transcription
46:7
transition
9:6
travels 39:22
triangle 40:7
trick 3:10
tried 8:11,13
Trinity 9:17
true 42:2
44:1 46:5,7
truth 43:8
try 3:13
trying 41:11
41:12
tune 37:16
turn 16:9
turned 14:6
15:11
TV 9:19
two 9:2 11:8
12:8,21
14:24 16:16
19:4 21:4
22:1 29:11
37:16 40:25
type 28:19
39:16
T.D 10:15
21:8

U

Uh-huh 13:7
38:14
ULMER 1:18
47:5
uncomfortable
3:17
under 31:14
34:16 46:3
undergrad
12:18
undergraduate
12:17
understand
19:6 20:5
20:13,16
22:14 23:4
23:9 26:1
27:4 28:4
29:25 31:1
41:8

understanding
16:12,15,19
24:18,20
27:1 47:14
understood
22:24 23:2
23:9,11,18
unimpressed
41:3
United 5:4
UNLESS 44:13
unquote 6:9
until 5:16,18
31:9
upgrading 8:4
use 2:7 4:17
15:25 16:6
16:16 29:11
uses 38:8
using 17:8
utilize 9:2
utilized 29:9

V

v 45:1 47:8
value 7:12
8:1
values 7:24
Vatican 12:3
verbalize
3:15 27:10
27:12
very 37:12
38:13 39:12
Victoriously
8:17 14:5
14:17 15:16
Vince 3:7
Vincent 1:13
1:16 47:18
2:6
Vision 12:20
12:21,22
voice 12:11
vs 1:5

W

W 1:13,16
walk 34:9
want 3:17,18
13:14 18:20
24:6 27:5,6
wanted 29:25
Warren 5:4,10
12:25 13:1
13:1,5,10
wasn't 19:8
20:24 32:16
way 3:12 4:15
6:2 7:18
9:5 17:9
19:11 27:13
32:22 36:1
39:12 41:6
Wealth 11:4
web 11:13,14

Wednesday 1:9
weeks 6:12,14
well 8:2
  10:13,19
  12:2,13,18
  14:3 16:22
  19:17 20:12
  20:20 21:3
  22:1 28:3
  29:14 32:14
  37:15 40:21
well-known
  10:1
went 6:7
  12:25 13:3
were 4:22
  5:12,20 6:1
  8:20 9:3,4
  14:10 17:3
  17:4,5,20
  22:18,24
  23:4,6,10
  23:11,15,19
  28:1,16,20
  31:23 32:9
  34:9 36:23
we'll 3:13
  41:20
we're 8:10
  18:6 22:12
  24:25,25
  30:6 35:2
  41:17
we've 7:18
  14:25 16:13
  21:21 29:9
  33:6 37:16
  37:21
Whichever
  4:16
while 6:4
  37:13
whole 24:23
  26:4,7
wife 38:4
willing 24:13
Wilson 24:9
  36:20,20,21
wind 28:16
withdraw 3:12
witness 3:3
  41:21 43:9
  45:2 47:20
witness's
  47:21
word 11:16
words 27:25
  30:23
work 3:13
working 40:24
works 41:6
world 8:2
  32:18 41:6
worse 10:5
wouldn't 23:7
  29:8

wrap 41:18
write 10:24
written 11:1
  11:2 15:18
  16:17
wrote 16:19

___ X ___
X 2:1

___ Y ___
yeah 22:2,4
  22:14 23:5
  24:6 32:11
  38:24 40:11
year 6:20
  21:10 24:24
  28:8 31:12
  32:16,19
  34:15 35:3
years 5:12,13
  9:3,25
  13:12 14:24
  16:16 19:4
  21:4 22:1
  29:10,11
  37:16
year-and-a...
  6:19

___ $ ___
$2 24:11
  25:22 26:2
  26:16 27:5
  27:5,13
$5 8:23 14:6
  16:14 19:23
$550,000
  16:24 22:21
  23:20

___ 0 ___
03 14:25 24:1

___ 1 ___
1 2:6 7:21
  43:25
1,400 7:5
1,500 6:8
10 40:15,16
12 27:6
1300 1:19
  47:6
14328 4:5
16 2:6
18 18:4
19 4:23
19th 7:24
1960 13:1
1966 5:15
1972 5:17
1980 5:17,17
1991 5:18
1993 5:18
  6:21 7:6

___ 2 ___
2 2:6 16:3,4
  25:12,16
  28:6,9
  40:20
2,000 6:8
20 13:8
2003 2:8,10
  7:24 18:4
  25:10 30:17
2004 2:9
  27:17 29:6
2005 1:9
  42:12 43:10
  47:4,21
201 1:11 47:2
22 2:8,9
  25:10
22nd 27:17
  29:6
23 1:9 2:7
24 26:19
25 2:8,10
25th 30:16
27 2:9
28 47:4
28th 43:9
29th 24:1
  26:14,14

___ 3 ___
3 2:3,3,7
  23:23,24
  33:11
3-23-05 47:9
30 2:10
30,000 10:17
3170 33:14
32 2:11
33494 47:2
36 13:12

___ 4 ___
4 2:8 25:3,4
  4:05 1:10
42 44:1
43220 1:17
44056 4:1
44114-1583
  1:20 47:7
450 11:18
480 40:13,14
4930 1:17

___ 5 ___
5 2:9 27:14
  27:15
5:31 41:22
50 10:20
  13:13
501(c)(3)
  15:16
55 1:11 47:1
550 40:13
550,000 18:7

21:12 23:16
  40:11
56 4:23

___ 6 ___
6 2:10 30:8
  40:14,16
64 13:4
65 6:16
650,000 7:25

___ 7 ___
7 2:6,11
  32:20,21,25
72 5:16

___ 8 ___
85259 4:6

___ 9 ___
90 38:10
900 1:19 47:6
921 3:25